615 So.2d 737 (1993)
Michael Lee THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
Michael Earl Staton, Appellant,
v.
State of Florida, Appellee.
Nos. 90-1107, 90-1106.
District Court of Appeal of Florida, First District.
February 19, 1993.
*739 Jefferson W. Morrow, Jacksonville, for appellant Thompson.
Clyde M. Collins, Jr., Jacksonville, for appellant Staton.
Robert A. Butterworth, Atty. Gen., Gypsy Bailey, Asst. Atty. Gen., Tallahassee, for appellee.

ON MOTION FOR REHEARING
ERVIN, Judge.
Michael Lee Thompson and Michael Earl Staton, appellants, appeal their convictions on nine counts each of armed sexual battery. Staton also appeals his nine consecutive life sentences. Although appellants' cases were not consolidated below, but were instead tried before two juries,[1] we consolidated the cases for oral argument and for this opinion, because the facts and many of the issues overlap.
Both appellants assert that the court erred in denying their individual motions to sever their cases, in admitting DNA evidence and in denying their individual motions for discharge for violations of their right to a speedy trial. In addition, Thompson individually contends that the court erred in admitting incriminating statements he made to a mental health worker, denying his motion for continuance, permitting his in-court identification by the victims, admitting evidence of a previous conviction for armed robbery, and permitting rebuttal witnesses to testify for the state without making a proper inquiry into possible discovery violations. Staton contends the court erred in admitting double hearsay of codefendant Thompson which implicated Staton, using dual juries, departing from the sentencing guidelines, sentencing Staton to nine consecutive rather than concurrent sentences, and in scoring excessive points for victim injury. We affirm without discussion the use of dual juries,[2] and affirm the court's denials of appellants' motions for discharge for the reasons stated below. We nevertheless reverse appellants' convictions and remand for new trials based upon the court's erroneous admission of double hearsay before the Staton jury, the erroneous admission of Thompson's previous conviction for armed robbery, and the failure to hold appropriate hearings regarding the state's rebuttal witnesses against Thompson. We do not reach any of the remaining issues.
The two victims, a mother and her 15-year-old daughter, lived in the Raintree Subdivision in Mandarin, near Jacksonville. On November 25, 1984, at approximately 3:15 a.m., two men armed with knives and wearing stocking masks and gloves broke into their home, demanded money, and each repeatedly sexually assaulted both women orally and vaginally. A few days following the assault, the mother selected a photograph of an individual later identified as Larry Lee Pickett from a photographic spread. The mother also participated in a voice identification in which she tentatively identified the voice of Doyle Glass, a public *740 defender, as one of her assailants. She later identified Thompson in a physical lineup in April 1985. At trial, the mother identified Thompson as the person whom she had recognized in the lineup. The daughter also identified Larry Pickett from the police photospread. In April 1985, the daughter observed a physical lineup of six individuals and then identified Thompson. Neither mother nor daughter was asked to identify co-defendant Staton in a lineup or photospread.
FDLE forensic pathologist James Pollick testified as a forensic serologist, stating that he had stored in a freezer for five years cuttings taken from the crime scene from a sheet, robe, and bedspread, on which he found semen and seminal staining. After the defendants' arrests in May 1989, the samples were transported to Maryland for deoxyribonucleic acid (DNA) examination. On cross-examination, Dr. Pollick admitted that this evidence could not be submitted to the FBI lab for DNA testing, because the FBI considered the samples to be too old.
Dr. Pollick testified that he tested Larry Lee Pickett's blood, saliva, pubic hair, and head hair, and confirmed the presence of PDM enzyme 2-1, which was Pickett's blood enzyme type, in two of the four semen stains he examined from the crime scene. He said it would not have been possible for Thompson, Staton, or either of the victims to have been responsible for the PDM 2-1 found in the semen stains. The court sustained the state's objection to cross-examination as to Larry Lee Pickett's blood, based on the absence of a proper predicate.
Nancy Thompson, Michael Thompson's wife, presented evidence of an alibi on behalf of Thompson, stating that she was dating Thompson at the time of the rapes, and that Thompson was with her until long after midnight on the night of November 24, 1984.
Because we do not reach appellants' challenges to the DNA evidence, we do not consider it necessary to summarize such evidence in this opinion. Suffice it to say that three witnesses were qualified as experts in the area of DNA profiling, and testified that statistically significant matches were found between DNA banding patterns in sperm taken from the cuttings labeled "[daughter's] bed" and "[mother's] robe," with DNA banding patterns from the blood labeled Michael Thompson and Michael Staton. One of the witnesses also acknowledged that an unidentified stain of DNA from the material labeled "[daughter's] bed" did not match either Thompson's or Staton's DNA.
A mental health counselor, Thomas Meade, testified that Thompson met with him in 1989 and admitted that he and Michael Staton had raped a mother and daughter in 1984. Detective Ray Myer testified that Meade informed him of the meetings, and that he thereafter arrested Thompson and Staton. This evidence is discussed more fully infra.
The juries found Thompson and Staton guilty of nine counts of armed sexual battery. Each was sentenced to nine consecutive life sentences.

I. MOTIONS FOR DISCHARGE

THOMPSON
Thompson was initially charged with sexual battery on May 9, 1989, and was returned to Florida from another jurisdiction on May 31, 1989. The 175-day speedy trial period under Florida Rule of Criminal Procedure 3.191 commences upon custody within the state of Florida after being charged with a crime. Thompson filed a motion for discharge on January 19, 1990, 203 days after he was returned to Florida, which was denied. He now claims the trial court erred in denying this motion. Thompson ignores, however, the significance of his motion for continuance filed July 24, 1989, submitted on the ground that his new attorney had just been appointed and needed more time to prepare for trial. The motion was granted. "[W]hen a defendant requests a continuance prior to the expiration of the applicable speedy trial time period for the crime with which he is charged, the defendant waives his speedy trial right as to all charges which emanate *741 from the same criminal episode." Stewart v. State, 491 So.2d 271, 272 (Fla. 1986). Accord Beverly v. State, 516 So.2d 30 (Fla. 1st DCA 1987); Birken v. Scheer, 543 So.2d 330 (Fla. 4th DCA), review denied, 553 So.2d 1166 (Fla. 1989).
The speedy trial requirement is reinstated upon the filing of a motion for discharge. State v. McCrery, 429 So.2d 739, 741 (Fla. 1st DCA), review denied, 438 So.2d 833 (Fla. 1983). Rule 3.191(d)(3) provides that when a court denies a motion for discharge based upon delay caused by the defendant, e.g., a continuance, "trial shall be scheduled and commenced within 90 days of a written or recorded order of denial." When Thompson filed his motion for discharge, trial had already been scheduled for February 26, 1990, and trial did begin on that date, which was within 90 days of the January 31, 1990 order of denial.[3] We accordingly affirm the court's denial of Thompson's motion for discharge.

STATON
Staton claims that because the trial court did not hold a hearing within five days of his motion for discharge, filed November 9, 1989, as required by the 1989 version of rule 3.191(i)(4), he was entitled to discharge. The motion was prepared pro se at a time when Staton was represented by an attorney, and the trial court summarily denied the motion on November 17, 1989. This court has frequently held that a pro se motion for discharge filed when the defendant was represented by counsel is a nullity, having no legal force or effect. Beverly, 516 So.2d at 31; Johnson v. State, 501 So.2d 94, 96 (Fla. 1st DCA 1987). Accord Salser v. State, 582 So.2d 12 (Fla. 5th DCA 1991), review dismissed, 613 So.2d 471 (Fla. 1993). At a hearing held July 31, 1989, the trial judge specifically stated, presumably because Staton had already filed a number of motions on his own, in spite of being represented by an attorney, "I will strike all motions filed by the defendant in proper person since he has counsel." Although Staton later represented himself during the course of this case, he did not begin doing so until February 9, 1990.[4] Staton filed a second motion for discharge on February 26, 1990, but trial began that same day. We affirm the court's denial of Staton's November 9, 1989 motion for discharge.

II. THOMPSON'S INCRIMINATING STATEMENTS TO MENTAL-HEALTH COUNSELOR MEADE

THOMPSON
At the pretrial hearing on his motion to suppress certain statements made by him to Meade, Thompson testified that he was released from prison for another crime on December 20, 1988, and called PRIDE in the middle of April 1989, asking for a referral for counseling services in Jacksonville. He was given the number of Thomas Meade, a counselor at the Mental Health Resource Center in Jacksonville. Thompson testified that he told Meade that he wished to confer with a psychologist, and that Meade came to his home one evening with Judith Henry. Thompson said he asked about confidentiality, and they told him that anything he said about his past would be confidential, but anything about future criminal conduct would have to be reported. Thompson admitted that neither Henry nor Meade told him they were psychologists or psychiatrists, but said that he thought Henry was a psychologist because she told him that she was licensed and had her own private practice.
Meade testified that he is a "crisis intervention specialist" with a B.A. degree and that although there are psychologists and psychiatrists on staff at his facility, he is *742 not under their direction and that the director of the agency was not a psychiatrist. Meade said he told Thompson that Judith Henry accompanied him because she was training to be on call for his agency, but that during the conversation it was stated that she was a therapist with a private counseling practice. Two days following the initial visit, Meade met with Detective Ray Myer and told him what Thompson had communicated to him. Meade said Thompson initiated two more meetings, and that he also reported the conversations to Myer, but testified that Myer did not instruct him in any way regarding the questioning of Thompson.
The court denied Thompson's motion in limine to invoke the psychotherapist-patient privilege. During trial, before the Thompson jury, Meade testified that Thompson told him during these meetings that he had raped a mother and her 14-year-old daughter in 1984 in Mandarin, Florida, with Michael Staton, while wearing masks and gloves.
The trial court properly concluded that Thompson's conversations with Meade, who was simply a crisis intervention specialist, were not protected by the privilege asserted. Section 90.503, Florida Statutes (1989), articulates the psychotherapist-patient privilege, and subsection (1)(a) defines "psychotherapist" as:
1. A person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, who is engaged in the diagnosis or treatment of a mental or emotional condition, including alcoholism and other drug addiction; or
2. A person licensed or certified as a psychologist[5] under the laws of any state or nation, who is engaged primarily in the diagnosis or treatment of a mental or emotional condition, including alcoholism and other drug addiction.
(Emphasis and footnote added.) The only time a client is authorized to invoke the privilege based upon a reasonable belief that the person is a psychotherapist is when the psychotherapist is a physician, under section 90.503(1)(a)(1).[6]
Thompson also claimed that his Miranda[7] rights were violated by collusion between Detective Myer and Meade, and denied making any confession to Meade. We agree that at some point during the proceedings below, the trial court should have inquired into the possibility that Meade acted as an agent for the police. Because, however, we are remanding for new trial as to other issues, as discussed infra, there is no need for us to determine this issue.

STATON
During trial, the court ruled that neither Meade nor Detective Myer could testify about Thompson's statement to Meade in front of the Staton jury. Accordingly, the Staton jury was removed from the courtroom during virtually all of Meade's testimony, including any mention of Thompson's admission. Myer was, however, ultimately permitted to recount Thompson's statement before the Staton jury, however, based upon the court's conclusion that Staton had opened the door to such testimony. We disagree.
*743 On the fourth day of trial, while Staton was still representing himself, Staton questioned Myer about his arrest on May 16, 1989, during cross-examination, and the following transpired:
Q. Detective Myer, prior to ... my arrest on May 16th, 1989 had you ever heard of me before?
A. Not that I'm aware of Mr. Staton.
Q. You stated that the reason you arrested me was not just because I [resembled] the physical description of the suspect, is that true?
A. That's true.
Q. Some other reasons because you knew I had been at one time a friend of Mr. Thompson?
A. That would be one of the reasons.
Q. And maybe Mr. Thompson at one time had been a prior suspect in this same case in 1985?
A. No, sir, I didn't say that... .
Q. Okay. Now you never arrested me because the victims never told you anything about me, is that correct?
A. That's correct.
* * * * * *
Q... . The information that you got for the arrest warrant when you first arrested me, where'd you get the information for the arrest warrant?

A. I got it from Nancy Herrin [Thompson's wife], Michael Thompson, got it from a lot of sources like that.
(Emphasis added.) The state then proffered outside the presence of the Staton jury Myer's testimony revealing that Myer had received information from Thompson disclosing that both Thompson and Staton had committed the rapes. The court instructed Staton that because he had raised the subject during cross-examination of Myer, he had opened the door, permitting the prosecutor to obtain an explanation regarding how he obtained the information leading to Staton's arrest. Over Staton's continuing objection, the court thereafter permitted Myer to testify at length about the details of Thompson's admission:
Q. What information did Mr. Mead[e] provide to you?
A. That they had gone to the Raintree Apartments and that Thompson had, I mean Staton had chosen the victims, picked them out, the ones they would hit, the targets they were going to commit the rapes on and they did commit the rapes. He told how they dressed with the mask and gloves and the acts they committed.
Q. This is what Mr. Mead[e] is telling you about what the defendant Michael Thompson told him?
A. That's correct.
Q. Did Mr. Mead[e] reflect whether or not Mr. Thompson said how old the younger victim was at the time of the offense?
A. He said she was 15, about 15.
* * * * * *
Q. Tell us what if anything Mr. Mead[e] told you about the defendant, Michael Thompson, said about the sexual acts that were committed?
A. He said that they had done a lot of things to them and he wished they could go back and do more things because he didn't do everything that he wanted to.
* * * * * *
Q. What'd he say?
A. He said they used knives.
Q. Did he also say whether or not gloves and masks were used?
* * * * * *
A. He said they had gloves and masks on.
Q. Did he tell, did Mr. Mead[e] tell you Mr. Thompson said about how the victims were selected?
A. He said Staton would pick them out in the subdivision.
We do not consider Staton's questions to Myer to have opened the door to the subject matter of Thompson's alleged statements made to Meade. Staton merely asked Myer from whom he obtained information for the arrest warrant, not what that particular information was. Myer adequately answered the question, and there was no reason for Myer to testify as to the nature of what Thompson had told Meade. *744 Cf. State v. Baird, 572 So.2d 904 (Fla. 1990) (because defense counsel did not open the door for the challenged testimony, officer's statement as to his motive for investigating defendant was inadmissible hearsay).
The state argues that any error resulting from the admission of Thompson's statement implicating Staton in the presence of the Staton jury was harmless because Myer's testimony was cumulative to that of Meade. We cannot agree for the simple reason that the Staton jury was not present during Meade's testimony. In that the state has failed to demonstrate harmless error beyond a reasonable doubt, reversal of Staton's conviction is required. Ciccarelli v. State, 531 So.2d 129 (Fla. 1988); Lee v. State, 508 So.2d 1300 (Fla. 1st DCA 1987), approved, 531 So.2d 133 (Fla. 1988).

III. WILLIAMS RULE EVIDENCE

THOMPSON
The state introduced as Williams[8] rule evidence the testimony of Officer J.R. Arnold disclosing that Thompson had been convicted in January 1985 for an armed robbery which occurred November 29, 1984, four days following the sexual batteries. The state claims that the evidence was relevant for the purpose of showing that Thompson planned the rapes, because he had used gloves during both the bank robbery and the rapes.
Section 90.404(2), Florida Statutes (1989), a codification of the Williams rule, permits evidence of other crimes to prove identity if there are "similar facts." The fact that the perpetrator in each crime in the case at bar wore gloves hardly constitutes an "unusual or unique" fact, which is required in order to admit such prejudicial evidence. See, e.g., Lee v. State, 508 So.2d 1300 (Fla. 1st DCA 1987), approved, 531 So.2d 133 (Fla. 1988). Officer Arnold's testimony about the robbery was not relevant to prove anything, except Thompson's bad character or propensity for committing criminal acts. Indeed, during closing argument, the prosecutor referred to Thompson as an "admitted bank robber." Moreover, Thompson's conviction for armed robbery became a feature of the state's rebuttal, compounding the error.
The state claims that Arnold's testimony was cumulative because Meade had already testified that Thompson told him about the bank robbery. We consider the trial court to have erred in permitting either witness to testify on this matter.
The state also claims that Thompson failed to preserve this issue for appeal because he did not object during the witnesses' testimony. Thompson's counsel filed a motion in limine to preclude introduction of this testimony, and renewed his objection before both Meade and Arnold took the stand. Nothing in the case law cited by the state required counsel to do more to preserve this issue for appeal. See, e.g., Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988); Phillips v. State, 476 So.2d 194 (Fla. 1985). Knowing that the trial court considered such evidence to be admissible, it was not necessary for counsel to continuously object. Donaldson v. State, 369 So.2d 691 (Fla. 1st DCA 1979).

IV. RICHARDSON INQUIRY

THOMPSON
Thompson claims that the trial court erred in failing to conduct Richardson[9] hearings regarding two rebuttal witnesses the state had not identified for the defense, Martha Clark and Mildred Maxwell, and the rebuttal testimony given by Detective Arnold about a statement Thompson allegedly had made to Arnold, which the state had not reported to the defense, after being arrested for another robbery on January 3, 1985. See Fla. R.Crim.P. 3.220(b)(1)(i), (iii). Following Thompson's timely objections, the court permitted proffers of the testimony but *745 made no inquiry concerning the circumstances of the omissions and the possible prejudice to the defendant, as is required for discovery violations under Richardson. See, e.g., Smith v. State, 500 So.2d 125 (Fla. 1986) (new trial is mandated when trial court fails to require state to show that defendant has not been prejudiced by state's failure to disclose statement of accused to police officer, even though it appeared to be harmless error); Hatcher v. State, 568 So.2d 472 (Fla. 1st DCA 1990) (failure to disclose rebuttal witness requires full inquiry), review denied, 577 So.2d 1328 (Fla. 1991); Martinez v. State, 528 So.2d 1334 (Fla. 1st DCA 1988) (reversible error for court to permit state to introduce statement of accused that had not been disclosed). Accordingly, the court erred in declining to conduct full inquiries regarding the witnesses and evidence Thompson asserted had not been disclosed to him.

V. CONCLUSION
In summary, we affirm the trial court's use of dual juries in these cases, and affirm the court's rejection of Thompson's and Staton's claims that their rights to speedy trial were violated. We reverse Staton's conviction because the court allowed the Staton jury to hear Officer Myers's testimony about Thompson's admission to Thomas Meade, which implicated Staton. We reverse Thompson's conviction because the trial court admitted evidence before the Thompson jury regarding Thompson's conviction for an armed robbery committed in 1984, and failed to conduct full Richardson hearings as to the state's rebuttal witnesses and evidence against him. We consequently remand each case for new trial.
AFFIRMED IN PART, REVERSED IN PART, and REMANDED for new trials.
WIGGINTON and ZEHMER, JJ., concur.
NOTES
[1] The evidence that was common to both defendants was tried in the same courtroom before both juries. The evidence that was applicable to only one of the defendants was tried separately outside the presence of the jury considering the case of the other defendant, with the exception of certain evidence which will be more fully discussed infra.
[2] Feeney v. State, 359 So.2d 569 (Fla. 1st DCA 1978); Velez v. State, 596 So.2d 1197 (Fla. 3d DCA 1992).
[3] Thompson claims the trial court denied his motion to discharge without either defendant or counsel being present. On the contrary, counsel was there and explicitly waived the appearance of his client.
[4] After Staton's attorney withdrew on December 4, 1989, the court appointed Steve Weinbaum to represent Staton. On February 8, 1990, the court heard Staton's pro se motion to represent himself, granted his motion, but kept Weinbaum in the case and at trial to assist if problems arose. On March 5, 1990, the fifth day of trial, Staton revoked his waiver of counsel and Weinbaum represented him thereafter.
[5] A "psychologist" is defined in chapter 490 as a person with certain doctoral-level training who is licensed by examination or endorsement. § 490.003(3), Fla. Stat. (1989).
[6] Thompson argues that a new provision of section 90.503 should apply to his case. Section 90.503(1)(a)(4) now includes in the definition of "psychotherapist":

Treatment personnel of facilities licensed by the state pursuant to chapter 394, chapter 395, chapter 396, or chapter 397, facilities designated by the Department of Health and Rehabilitative Services pursuant to chapter 394 as treatment facilities, or facilities defined as community mental health centers pursuant to s. 394.907(1), who are engaged primarily in the diagnosis or treatment of a mental or emotional condition, including alcoholism and other drug addiction.
The trial took place in February and March 1990, and the new provision did not take effect until October 1, 1990. Ch. 90-347, §§ 40, 41, at 2954-55, Laws of Fla. Thus, the new provision could not have applied at trial, and, because the privilege is a substantive right enjoyed by the patient, it cannot be applied on appeal.
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[8] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
[9] Richardson v. State, 246 So.2d 771 (Fla. 1971).