762 So.2d 879 (2000)
Fred Lorenzo BROOKS, Appellant,
v.
STATE of Florida, Appellee.
No. SC92011.
Supreme Court of Florida.
May 25, 2000.
Rehearing Denied July 26, 2000.
*882 Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court adjudicating Fred Lorenzo Brooks guilty of first-degree murder and imposing the death penalty.[1] We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. As explained below, we affirm Brooks' conviction but reverse his sentence of death and remand for a new penalty phase hearing before a new jury because the prosecutor made numerous improper comments during closing argument in the penalty phase of the trial.

I. FACTS
A Duval County Grand Jury returned an indictment charging Fred Lorenzo Brooks with first-degree murder; aggravated battery; armed robbery; armed trafficking in cocaine; conspiracy to traffic in cocaine; and possession of a firearm by a convicted felon. The grand jury also returned an indictment charging Foster Brown with the same offenses as Brooks,[2] and the defendants were tried jointly before the same jury. The evidence presented at trial reflects the following facts.
At approximately 10:30 p.m. on the evening of August 28, 1996, Jacqueline Thompson and Tyrone Simmons were positioned at the corner of 23rd Street and Myrtle Avenue in Jacksonville, Florida where Thompson was selling drugswhen Fred Brooks and Foster Brown drove up in a red Toyota Camry (the Camry).[3] *883 Both Thompson and Simmons knew Brooks and Brown. Brown was driving the Camry as it approached, and Brooks asked where he and Brown could find some "juggler action," which, according to Thompson, is street slang for big rocks of crack cocaine. Thompson asked if they had any money, and Brooks produced five one-hundred-dollar bills. Thompson then inquired how much she would receive from the deal, and they replied with four "jugglers." After agreeing to accompany Brooks and Brown, Thompson entered the back seat of the Camry along with Brooks, while Simmons replaced Brown in the driver's seat, with Brown moving to the front passenger seat before the group drove away.
In the same time frame in which the above-described events were transpiring, Michael Johnson drove his 1973 Chevrolet Impala (the Impala) to the home of Darryl Jenkins, his long-time friend, which was located at 2022 West 13th Street in Jacksonville, Florida. Johnson traveled to the home to meet Lashan Mahone, his girlfriend, so that he and Mahone could go to a club later that night. Mahone had not yet arrived at Jenkins' home when Johnson drove up, so Johnson backed his Impala into the driveway, opened the driver's side door, and sat in the car listening to music. Mahone arrived several minutes later, positioned her vehicle next to the Impala, and went over to Johnson. Johnson and Mahone began talking and listening to music, while Darryl Jenkins and another man, Jessie Bracelet, sat in chairs in the driveway near the front of Mahone's car.
During this time period, the passengers in the Camry were traveling to Jenkins' house, where Thompson had already purchased drugs earlier that evening.[4] Though not a drug user like Jenkins, Michael Johnson often sold drugs from Jenkins' home, and Thompson had known Johnson for at least five years and had regularly purchased crack cocaine from him. Thompson testified that she accompanied Brooks and Brown to Jenkins' house because they had never conducted a drug transaction with Johnson, and therefore he would not have "served" them without her assistance. On the way to Jenkins' house, Brooks and Brown specifically stated that they wanted to buy fifty rocks, or $500 worth of crack cocaine. As the group proceeded to the destination, neither Thompson nor Simmons saw any weapons or heard any mention of a robbery. Also during the drive to Jenkins' house, Thompson stated that she would first buy a $10 "dime rock" of crack cocaine from Johnson to provide Brooks and Brown with a sample of the drug they would be obtaining.
The Camry and its passengers arrived at Jenkins' home several minutes after Mahone had arrived at that location. Simmons parked the Camry approximately ten to twenty-five feet from Jenkins' driveway. Thompson exited the vehicle and proceeded towards Jenkins' house, at which point Johnson called her over. Thompson bought a dime rock from Johnson and indicated that she had two "dogs" (meaning friends) who wanted to spend $500. Thompson then returned to the Camry with the dime rock and spoke with Brooks and Brown. After examining the rock purchased by Thompson, Brown stated that the rock was "decent," but Brooks expressed his view that the rock was "too flat." Brooks changed his mind as to purchasing fifty rocks and stated that he only wanted to purchase thirty. Thompson returned to the back seat of the Camry, and a chain of events related to the drugs *884 subsequently ensued among Johnson, Brooks, and Brown, which occurred near the trunk area on the passenger side of Johnson's Impala.[5] As the transaction began, Simmons and Thompson were sitting in the Camry, Mahone was sitting in the driver's seat of Johnson's Impala, and Jenkins, along with Jessie Bracelet, were still sitting in chairs in the driveway near the front of Mahone's car.
According to Johnson, who testified that he had been selling crack cocaine almost every day for approximately two years, after he sold the dime rock of crack to Thompson, he walked over to Jenkins and obtained a sandwich bag containing what, in his opinion, was crack cocaine. Johnson did not know exactly how many rocks were in the bag, but he testified that he knew there were "enough to sell 50 rocks," each identical in shape and weighing approximately one gram. Through Johnson's extensive experience in dealing with crack cocaine, he knew that a "juggler," or rock of crack cocaine, weighs one gram. After retrieving the sandwich bag from Jenkins, Johnson moved to the trunk area on the passenger side of his Impala, and he recognized the two men approaching him as Brooks and Brown. He inquired if they were the individuals who wanted to purchase fifty rocks, and Brown replied that they only wanted thirty rocks.
Johnson testified that he was standing in the middle of Brooks and Brown, with Brown on his left and Brooks on his right, closest to the back seat of the Impala. Johnson observed Brown holding several one hundred dollar bills in his hand, but Johnson testified that he never received money from anyone other than Thompson, who had previously given him $10 to purchase the initial dime rock.[6] Johnson untied the sandwich bag, reached in, and started to count the rocks. At about the time this occurred, Johnson observed Brooks reaching into his pocket, and Johnson thought Brooks was merely retrieving money. However, Johnson then observed that Brooks was actually pulling a gun from his pocket, which he noticed when it hit the side of the Impala. Johnson dropped the sandwich bag of crack cocaine on the trunk of the car and heard Jenkins make a statement in the nature of, "Hey, man, what's up? He got a gun or something." Johnson then saw Brooks point the gun at Jenkins and shoot one time. Johnson turned and ran in fear past Brown, who stepped back as though he was reaching for something in his pocket as Johnson ran toward the gate in front of Jenkins' home. Johnson then heard ten to twelve more gunshots as he ran through the yard; it sounded as though two guns had fired because one sounded louder than the other. While Johnson was running away, a bullet struck him in the back, exited through his chest and hit him in the arm. Johnson made it to safety around the back of Jenkins' home, where someone helped him in through the back door. Shortly thereafter, Lashan Mahone transported Johnson to the hospital, and he never again saw the sandwich bag containing crack.
Johnson's testimony concerning the shooting was consistent with other testimony elicited at trial. Jacqueline Thompson remembered a voice calling, yelling, or screaming something from the driveway, and she then heard gunfire. She turned and looked out of the back window of the Camry, and saw Brooks firing a weapon over the top of Johnson's Impala. After lowering her head, she heard ten to fifteen more gunshots. Similarly, Tyrone Simmons *885 heard a loud voice and gunshots coming from the rear of the Camry. When Simmons turned and looked through the rear window, he also saw Brooks firing a weapon and a person running through a gate towards Jenkins' home. Simmons also heard more shots after he lowered his head.
Jessie Bracelet, who had been seated next to Jenkins, testified that he had gotten up from his chair and taken two to three steps when he heard Jenkins scream, "He's got a gun." Bracelet looked back and saw the man on Johnson's right (Brooks) extend his arm and fire at Jenkins, who was standing by that time. The gunman was approximately fifteen feet away from Bracelet when Jenkins was shot. At trial, Bracelet identified Brooks as the gunman. Upon being shot, Jenkins slumped, reached for his chest, and then began to run for safety across the street. Bracelet also ran away and heard ten to fifteen more gunshots, several of which were fired at him. It sounded as though the gunshots were coming from two different weapons because some shots were louder than others.
Finally, Lashan Mahone testified that she saw one man on Johnson's left side and one on his right during the drug transaction at the rear of the Impala. She heard Jenkins scream and then heard a shot. She then turned and saw Johnson running through the fence near Jenkins' house. She saw one of the men standing with a gun in his hand, and it looked like the man who had been on Johnson's right, closest to her. She stated that she saw the man shooting at Johnson as Johnson ran down the side of Jenkins' house. Mahone heard more gunshots emanating from the rear of the Impala after she ducked down in the seat of that vehicle.[7]
After the gunshots ceased, Brooks and Brown ran back to the Camry and jumped in the front passenger seat, Brooks on top of Brown. Thompson saw Brooks holding a "big silver automatic gun" in his hand, and she saw Brown holding a dark-colored gun in his hand. Similarly, Simmons saw Brooks holding a "chrome-plated 9 millimeter" gun in his hand, but he did not see Brown holding a gun. At the direction of Brooks and Brown, Simmons drove the Camry away from Jenkins' house, ultimately arriving at a location, on 14th Street, where Simmons and Thompson exited the vehicle.[8]
Back at Jenkins' house, Lashan Mahone exited the Impala as soon as the Camry drove away, and she started walking towards Jenkins' house. She stopped and looked around, having a clear opportunity to see both the trunk of the Impala and the surrounding areas. As she surveyed the area, Mahone did not see anyone else near the Impala, nor did she see any drugs on either the trunk or sides of that vehicle. A young lady named Kathy then exited Jenkins' house and said, "Don't panic. You need to take Michael to the hospital." Mahone helped Johnson into her car and transported him to the hospital.
Darryl Jenkins' body was found lying in a neighbor's driveway at 2023 West 13th Street, across the street from his home. Officer Robyn Pierce of the Jacksonville Sheriff's Office was on duty at 10:57 p.m. *886 on August 28, 1996, and was dispatched to that location. When Officer Pierce arrived, rescue personnel were already there working on Jenkins, but Jenkins expired while Pierce was on the scene; he died from a single gunshot wound to the middle of the chest, with the bullet passing through his heart and left lung, exiting from the lower left side of his chest beneath the armpit. The wound suffered by Jenkins would not have caused instantaneous death, but he would have died within seconds, not minutes. There was a blood trail leading from Jenkins' body and crossing the street, but no weapon was found at Jenkins' house or near his body. Finally, ten shell casings from a nine millimeter pistol were found on the trunk of the Impala and on the ground beside that vehicle.
After considering the evidence presented at trial, the jury returned separate general verdicts finding both Brooks and Brown guilty of first-degree murder in the death of Darryl Jenkins, and also finding both defendants guilty of the aggravated battery of Michael Johnson. The trial court then conducted a penalty phase hearing during which Brooks and Brown were tried jointly before the same jury that had served during the guilt phase of the trial. Following the presentation of evidence by the State, Brooks and Brown, the jury returned a verdict recommending life for Brown and, by a vote of seven to five, death for Brooks. After conducting a hearing pursuant to Spencer v. State, 615 So.2d 688, 690 (Fla.1993), the trial court sentenced Brooks to death on the first-degree murder charge and thirty years in prison as a habitual felony offender on the aggravated battery charge. In its sentencing order, the trial court found the following aggravating circumstances: (1) Brooks had been previously convicted of another capital felony or a felony involving the use or threat of violence to the person; (2) the capital felony occurred during the commission of, or an attempt to commit, robbery and trafficking in cocaine; and (3) the capital felony was committed for pecuniary gain. The court merged the second and third aggravating circumstances and considered them as one. The court rejected the following statutory mitigating circumstances: (1) Jenkins was a participant in Brooks' conduct or consented to the act; and (2) the capital felony was committed while Brooks was under the influence of extreme mental or emotional disturbance. Finally, the court considered Brooks' family background, including the death of his mother[9] and father, as a statutory mitigating circumstance under section 921.141(6)(h), Florida Statutes (Supp. 1996),[10] and the court afforded slight weight to that mitigating circumstance. Brooks' direct appeal from his first-degree murder conviction and death sentence now follows.

II. ISSUES AND ANALYSIS
In this appeal, Brooks presents twelve issues for our consideration.[11] Two of the *887 issues raised by Brooks relate to his legal representation at trial: (1) whether the trial court abused its discretion concerning attempts by Brooks to retain counsel of choice; and (2) whether the trial court made an erroneous ruling regarding defense counsel Nichols' motion to withdraw from representation. Next, Brooks raises five issues concerning the guilt phase of the trial and his conviction: (1) whether the trial court erred in granting the State's motion to consolidate the codefendants' trials; (2) whether the trial court abused its discretion in allowing Tony Carr to testify that his Camry was not returned as agreed and was found abandoned approximately one week later; (3) whether the trial court clearly erred in allowing Michael Johnson to express his opinion regarding the identity and weight of the rocky substance contained in the sandwich bag obtained from Darryl Jenkins; (4) whether the State presented sufficient evidence to convict Brooks for either first-degree premeditated or felony murder;[12] and (5) whether the trial court erred in instructing the jury on both first-degree premeditated and felony murder. Finally, Brooks raises five issues related to the penalty phase of the trial and his sentence: (1) whether the prosecutor's closing argument during the penalty phase of the trial deprived Brooks of a fair sentencing proceeding; (2) whether the trial court erred in finding the merged robbery/pecuniary gain aggravating circumstance; (3) whether the trial court erred in finding that Darryl Jenkins' conduct did not constitute a mitigating circumstance under section 921.141(6)(c), Florida Statutes; (4) whether Brooks' death sentence is disproportionate; and (5) whether the trial court erred in denying Brooks' request to bifurcate the penalty phase of the trial.[13] We first consider Brooks' claims concerning his legal representation at trial, then turn our attention to the claims touching upon the guilt phase of the trial and the conviction. Finally, we address the dispositive claim raised by Brooks regarding the penalty phase of the trial: the prosecutor's improper comments during closing argument.[14]

A. LEGAL REPRESENTATION ISSUES

1. BROOKS' ATTEMPTS TO RETAIN COUNSEL OF CHOICE
The first claim presented by Brooks regarding his legal representation at trial focuses on his attempts to retain counsel of his choice. Brooks asserts that approximately one week prior to trial, the trial court denied his request for a continuance to enable him to retain private counsel. Based on this alleged denial of a continuance, Brooks argues that the trial court did not afford him a sufficient opportunity to retain counsel of his choice as guaranteed by the Sixth Amendment of the United States Constitution. The record in this case, however, refutes Brooks' claim.
Brooks was arrested in connection with this case on September 20, 1996, and the *888 trial court appointed the public defender to represent him. On September 24, 1996, following certification of conflict by the public defender's office, the trial court appointed attorney Jeff Morrow to represent Brooks. Thereafter, on November 21, 1996, the trial court granted Brooks' first motion for continuance.
On February 3, 1997, after being advised by Brooks that he was not satisfied with Mr. Morrow's representation, the trial court appointed attorney Richard Nichols to represent him. During a hearing held on February 7, 1997, Brooks informed the trial court that his family was "supposed to have a lawyer by the 21st," but the court had already scheduled jury selection in the trial to begin on February 24. At that point, the trial court explained that it had (1) previously appointed able defense counsel, Mr. Morrow, but Brooks could not get along with him; (2) there had been no showing that Mr. Morrow was incompetent, but, in an abundance of caution, the court appointed Mr. Nichols to represent Brooks; and (3) if Brooks intended to retain private counsel, he needed to do so soon because the trial would begin on February 24, 1997.
On February 24, the trial court again granted Brooks a continuance to enable him to retain private counsel, Wade Rolle, and to give Mr. Rolle an opportunity to prepare for trial. The following day, Mr. Rolle was present in court, and the trial court agreed to pass the case for one week to determine if Mr. Rolle would, in fact, represent Brooks, and to set a new trial date. On March 3, 1997, Mr. Nichols was present in court, but Mr. Rolle did not appear. Instead, the prosecutor informed the court that Mr. Rolle had left a phone message that "he had not been retained yet." One of Brooks' family members present in the courtroom replied, "We're supposed to take care of it today." The trial court agreed to pass Brooks' case once again. Apparently, satisfactory arrangements could not be reached with Mr. Rolle, and another attorney, Butch Berry, informed the prosecutor that he might represent Brooks; Mr. Berry never entered an appearance in the case.
Thereafter, on March 11, 1997, another attorney, Donald Mathews, appeared in court and announced that Brooks' family had approached him to retain his legal services. The trial court stated that the next pretrial conference was to be held on March 18, and Mr. Mathews would need to inform the court at that time whether or not he would actually represent Brooks. At this point, Mr. Nichols still continued to represent Brooks. On March 18, Brooks' case again was passed, with Mr. Nichols still representing Brooks; Mr. Matthews never entered an appearance in the case.
On April 9, 1997, the name of another defense attorney, Janine Sasser, was mentioned in open court. Mr. Nichols stated that he had been advised that Ms. Sasser had been retained and was going to make an appearance on Brooks' behalf. The trial judge announced that jury selection was set for April 21, 1997, and Mr. Nichols agreed that he was ready to try the case as scheduled.
On April 15, 1997, Ms. Sasser was present in court and stated that she wished to enter the case, but because she could not try the case on April 21, she would need a continuance. The trial court recognized Brooks' right to retain counsel of choice, but noted that Brooks remained indigent and "at a certain point the court cannot be manipulated further." The court required Mr. Nichols to continue representing Brooks, but also asked the attorneys, including Ms. Sasser, if they had any case law indicating that Brooks had the right to a continuance under the given circumstances. The court continued the case to enable the parties to research whether Brooks was entitled to have Ms. Sasser represent him. Two days later, it was made known in open court that Ms. Sasser was unable to represent Brooks due to a conflict of interest. Therefore, Mr. Nichols remained Brooks' counsel, and he represented *889 Brooks throughout the trial below.
Based on the facts set forth above, it is clear that Brooks' claim here lacks merit. The trial court clearly afforded Brooks numerous opportunities to retain counsel of choice, and contrary to Brooks' assertions in this Court, the trial court here actually granted a continuance in consideration of Ms. Sasser's possible representation to ascertain whether another continuance should be granted so that Ms. Sasser could prepare to represent Brooks at trial. Moreover, Ms. Sasser ultimately could not represent Brooks due to a conflict of interest. Accordingly, we reject Brooks' claim here. Cf. Hunter v. State, 660 So.2d 244, 249-50 (Fla.1995) (finding trial court did not abuse its discretion in denying second motion for continuance where case had been pending for at least ten months, defense counsel still had over three weeks to prepare for trial, and no was prejudice shown); Grossman v. State, 525 So.2d 833, 836 (Fla.1988) (finding trial court did not abuse its discretion in denying defendant's third request for a continuance filed four days prior to trial).

2. DEFENSE COUNSEL NICHOLS' MOTION TO WITHDRAW FROM REPRESENTATION
Brooks' second claim regarding his legal representation at trial focuses on whether it was proper for Mr. Nichols to provide representation. Mr. Nichols filed a motion to withdraw from representation of Brooks, citing both Brooks' indications of dissatisfaction with the representation and Brooks' increasing hostility directed to him. The trial court conducted an in-camera hearing to address the motion to withdraw, and after full consideration entered a denial. The substance of the claim presented to this Court is centered upon the basis that the trial court failed to conduct a sufficient inquiry during the in-camera hearing. Brooks further argues that even if the trial court conducted a sufficient inquiry, it erred in its conclusion that insufficient cause for discharge of Mr. Nichols had been presented. Finally, Brooks asserts that the trial court failed to properly advise him during the in-camera hearing of the right to represent himself pursuant to Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). For several reasons, we find all of these claims to be without merit.
First, the record clearly shows that during the in-camera hearing, both Mr. Nichols and Brooks agreed that their prior difficulties had been based on a misunderstanding that no longer existed. Mr. Nichols specifically requested during the hearing to rescind his motion to withdraw, and although Brooks initially opposed rescission of the motion, he later acquiesced to such rescission after the trial court had fully considered the detailed factual circumstances surrounding the prior difficulties between Brooks and Mr. Nichols. Thus, Brooks waived the first two arguments that he now presents to this Court regarding the motion to withdraw.
Second, the record clearly reflects that Brooks did not make an unequivocal assertion of the right to self-representation during the in-camera hearing. Therefore, the trial court was not required to conduct a Faretta inquiry. See, e.g., State v. Craft, 685 So.2d 1292, 1295 (Fla.1996) ("This Court has repeatedly held that only an unequivocal assertion of the right to self-representation will trigger the need for a Faretta inquiry."). For the above-stated reasons, we reject the claim now asserted by Brooks.

B. GUILT PHASE ISSUES

1. CONSOLIDATION OF CASES
During a pretrial hearing, the State expressed its intention to file a motion to consolidate the cases of Brooks and Brown. In response, counsel for Brooks voiced no objection to the consolidation, stating, "I don't see any reason [why] the court would not consolidate." Three days after this hearing, the State filed a written *890 motion to consolidate, which the trial court granted. Thereafter, neither Brooks nor Brown filed a motion for severance, and they were tried jointly before the same jury. Brooks now claims that the trial court erred in granting the State's motion to consolidate. We reject his claim because it was waived in the trial court. See Fla. R.Crim. P. 3.153(a) (providing, in pertinent part, that a motion for severance of defendants is waived if not timely made); cf. State v. Mateen, 678 So.2d 449, 450-51 (Fla. 2d DCA 1996) (holding that codefendants waived the right to consolidate criminal charges under rule 3.151 of the Florida Rules of Criminal Procedure because they failed to move for consolidation); Sharif v. State, 436 So.2d 420, 422 (Fla. 4th DCA 1983) (finding that defendant waived his right to appeal joinder of misdemeanor and felony offenses because he failed to challenge the joinder of such offenses in the trial court). Moreover, even if Brooks had moved for severance in the trial court, it is clear that the facts and legal positions involved in this case would not have required the court to grant such a motion. See, e.g., Johnson v. State, 720 So.2d 232, 236 (Fla.1998); Coleman v. State, 610 So.2d 1283, 1285 (Fla.1992).

2. ADMISSION OF TONY CARR'S TESTIMONY CONCERNING THE CAMRY
Prior to trial, the State filed a written notice of its intent to introduce evidence that Brooks and Brown had unlawfully used the Camry owned by Tony Carr. Shortly before jury selection commenced, Brown's counsel objected to the admission of such evidence, and the trial court ordered that the prosecutor not mention such factors during jury selection. Following jury selection, the trial court considered Carr's expected testimony that Brooks and Brown paid $50 for the use of the Camry on the day before Jenkins was shot and that the vehicle was not returned that night as agreed, but was found abandoned approximately one week later. After entertaining argument from all counsel, the court determined that Carr's expected testimony was relevant to placing the defendants with the Camry and to Carr's credibility, and, after weighing such testimony under section 90.403, Florida Statutes (1995), the court determined that such testimony would be admissible.
The State presented Carr in its case and he testified that Brooks and Brown paid $50 for the use of his Camry on the day before Jenkins was shot. Thereafter, the vehicle was not returned that night as agreed but was found abandoned approximately one week later. See supra note 3. Neither counsel for Brooks or Brown renewed the prior objections to Carr's testimony, either before he took the stand or during his testimony, and both counsel proceeded to cross-examine him. Brooks now asserts that the trial court abused its discretion in allowing Carr to testify that the Camry was not returned as agreed but was found abandoned approximately one week later. The State argues that this claim was not preserved for appellate review and, even if properly preserved, such claim is without merit. We agree with the State.
First, by not contemporaneously objecting to Carr's testimony when it was elicited during the State's case, the challenge regarding such testimony has been waived for appellate review. See, e.g., Pomeranz v. State, 703 So.2d 465, 470 (Fla.1997) ("Failure to object to collateral crime evidence at the time it is introduced violates the contemporaneous objection rule and waives the issue for appellate review."); Correll v. State, 523 So.2d 562, 566 (Fla.1988) ("Even when a prior motion in limine has been denied, the failure to object at the time collateral crime evidence is introduced waives the issue for appellate review.").[15] Moreover, even if this challenge *891 had been properly preserved for appellate review, we would find it to be without substantive merit. See, e.g., Griffin v. State, 639 So.2d 966, 968-69 (Fla.1994). Therefore, we reject this claim as presented by Brooks.

3. ADMISSION OF MICHAEL JOHNSON'S OPINION TESTIMONY
Michael Johnson testified as the State's first witness. During direct examination, he testified that his long-time friend, Darryl Jenkins, used crack cocaine and often sold that drug from the Jenkins home. Johnson indicated that he did not use crack cocaine, but he had been selling that drug almost every day for approximately two years. Johnson stated that he often sold crack cocaine from the Jenkins home, with Jacqueline Thompson being one of his regular customers.
Regarding the night in question, Johnson testified that he observed the Camry arrive at the Jenkins home, whereupon Jacqueline Thompson exited the vehicle. Thompson walked over to Johnson's Impala and purchased a $10 rock of crack cocaine, and after Thompson indicated that there were two men in the Camry who wanted to buy fifty rocks, Johnson agreed to "serve" them. Johnson testified that after Thompson returned to the Camry, he obtained a sandwich bag containing crack cocaine from Darryl Jenkins. Johnson observed the contents of the bag and found them to be "about a gram in size and identical in shape." Further, although Johnson did not know the exact number of rocks that were in the bag, he knew the bag contained enough to sell fifty rocks. Finally, Johnson confirmed that he was intimately familiar with the appearance of crack cocaine and had never received any complaints that the crack cocaine he sold was bad, defective, or fake. After several defense objections, the trial court conducted a voir dire examination to determine whether Johnson would be permitted to express opinions regarding the identity and weight of the rocky substance contained in the sandwich bag obtained from Darryl Jenkins, which was the center of the transaction that night.
During the voir dire examination, Johnson stated that he had sold drugs earlier in the evening prior to the transaction with Brooks and Brown. He had previously seen a quantity of fifty or more rocks of crack cocaine on more than five occasions, and he had, on a prior occasion, weighed more than fifty rocks of cocaine on a digital, triple-beam scale. Regarding the sandwich bag of rocks obtained from Darryl Jenkins, Johnson stated that he had not previously engaged in sales of the specific rocks from that bag earlier in the evening. He did confirm, however, that he had examined the contents of the bag and knew that there was enough to "serve" at least fifty rocks. Further, Johnson stated that he knew the weight of the rocks based on experience because a "juggler," or rock of crack cocaine, weighs one gram. Finally, while being questioned by defense counsel concerning "cornbread," which is allegedly a form of crack cocaine weighing less than regular crack cocaine, Johnson reiterated that neither he nor Jenkins ever sold "bad dope" from the Jenkins home. After hearing Johnson's proffered testimony and considering argument submitted by both prosecution and defense, the trial court determined that Johnson would be *892 permitted to express his opinion, in the form of expert testimony, regarding the identity and weight of the rocky substance contained in the sandwich bag which he had obtained from Darryl Jenkins. On appeal, Brooks claims that the trial court clearly erred in making this determination. We reject Brooks' claim on the merits.[16]
Section 90.702, Florida Statutes (1999), provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
It is within the trial court's discretion to determine a witness's qualifications to express an opinion as an expert, and the court's determination in this regard will not be reversed absent a clear showing of error. See, e.g., Geralds v. State, 674 So.2d 96, 100 (Fla.1996); Ramirez v. State, 542 So.2d 352, 355 (Fla.1989); Johnson v. State, 438 So.2d 774, 777 (Fla.1983); see generally Charles W. Ehrhardt, Florida Evidence § 702.1, at 552-53 (1999 ed.). After considering these standards, case law from this State and other jurisdictions, as well as the facts of this case, we conclude that the trial court did not clearly err in allowing Michael Johnson, an experienced crack cocaine dealer, to express opinion testimony regarding the identity and approximate weight of the rocky substance contained in the sandwich bag obtained from Darryl Jenkins.

a. IDENTITY OF THE ROCKY SUBSTANCE
In A.A. v. State, 461 So.2d 165, 165-66 & n. 1 (Fla. 3d DCA 1984), the trial court allowed a police officer to testify as an expert with "specialized knowledge" that, in his opinion, the substance possessed by the defendant was marijuana. The officer had been with the police department for nine years and had worked four years in a special narcotics unit; he had participated in numerous courses relating to narcotics investigation; he had seen and smelled "tons" of marijuana during his career; and his prior substance identifications had always been corroborated by lab tests. See id. at 166. The officer formed his opinion regarding the particular substance possessed by the defendant based upon sight, smell, the packaging of the substance, and the fact that the defendant possessed "rolling papers." See id. On appeal, the Third District approved the admission of the officer's testimony, holding that the trial court did not "abuse its discretion by finding that the officer qualified, through his training and extensive work experience, as an `expert' in marijuana identification." Id. (citing, among other authorities, section 90.702, Florida Statutes (1983)); cf., e.g., Pama v. State, 552 So.2d 309, 311 (Fla. 2d DCA 1989) (determining that the State adequately proved substance was marijuana based on experienced law enforcement officer's examination and identification of the substance); Dean v. State, 406 So.2d 1162, 1164 (Fla. 2d DCA 1981) (finding that jury could properly find defendant *893 guilty of marijuana possession based on testimony of experienced narcotics officer that he saw occupants of car smoking cigarette in manner commonly used in smoking marijuana, and he smelled strong odor of marijuana emanating from the car immediately thereafter).
Although the Third District's decision in A.A. addressed whether an experienced law enforcement officer could properly express an opinion, as an expert, regarding the identity of marijuana, it appears that no Florida appellate decision has addressed whether a person who is experienced with marijuana or another controlled substance as either a dealer, user, or both, may similarly be qualified to express such an opinion. Courts in many other jurisdictions have, however, allowed such persons to express opinion testimony regarding the identity of alleged controlled substances. See, e.g., United States v. Dominguez, 992 F.2d 678, 681 (7th Cir. 1993) (stating that circumstantial evidence establishing identity of an alleged controlled substance may include, among other things, "lay-experience based on familiarity through prior use, trading, or law enforcement," citing United States v. Manganellis, 864 F.2d 528, 541 (7th Cir. 1988)); United States v. Paiva, 892 F.2d 148, 157 (1st Cir.1989) (finding that witness may express opinion regarding identity of an alleged controlled substance "based on past experience and personal knowledge and observation"); State v. Saez, 173 Ariz. 624, 845 P.2d 1119, 1124 (App.1992) (stating that a majority of jurisdictions "have held that drug abusers or addicts may possess sufficient qualifications to testify about matters at issue in a narcotics prosecution"); Copeland v. State, 430 N.E.2d 393, 396 (Ind.Ct.App.1982) (finding that trial court did not abuse its discretion in allowing experienced drug addict to testify as an expert witness regarding identity of dilaudid); Commonwealth v. Dawson, 399 Mass. 465, 504 N.E.2d 1056, 1057 (1987) (stating that "[t]he great weight of authority in this country permits... an experienced user of a controlled substance to testify that a substance that he saw and used was a particular drug"); State v. Rubio, 110 N.M. 605, 798 P.2d 206, 208 (App.1990) (determining that witness's "experience as a successful cocaine dealer qualified him to give his opinion that the substance was cocaine"); Hill v. Commonwealth, 8 Va.App. 60, 379 S.E.2d 134, 136 (1989) ("Users and addicts, if they have gained a familiarity or experience with a drug, may identify it. Numerous courts have permitted lay purchasers of drugs to testify as to the identification of drugs after previous use has been demonstrated."); State v. Hernandez, 85 Wash.App. 672, 935 P.2d 623, 625 (1997) (stating that "a witness who demonstrates an expertise `acquired either by education or experience' in this area may give an opinion as to the identity of a substance"); see generally Michael D. Blanchard & Gabriel J. Chin, Identifying the Enemy in the War on Drugs: A Critique of the Developing Rule Permitting Visual Identification of Indescript White Powder in Narcotics Prosecutions, 47 Am. U.L.Rev. 557 (1998); J. Allison DeFoor, II, Consumer Testimony as Proof of Identity of the Controlled Substance in a Narcotics Case, 33 U. Fla. L.Rev. 682 (1981); W.A. Harrington, Annotation, Competency of Drug Addict or User to Identify Suspect Material as Narcotic or Controlled Substance, 95 A.L.R.3d 978 (1979 & 1999 Supp.). It is our view that, upon establishment of a proper predicate, a drug dealer under these circumstances may express an opinion, in the form of expert testimony, regarding the identity of crack cocaine. We do not reach the issue as to any other possible controlled substance.
In the present case, the State presented evidence that (1) Michael Johnson was an experienced crack cocaine dealer, having sold that drug almost every day for approximately two years; (2) Johnson never sold bad, defective, or fake crack; (3) Johnson obtained the sandwich bag which contained the substance from his long-time friend and associate, Darryl Jenkins, who *894 was a crack cocaine user and dealer who did not sell bad, defective, or fake crack; (4) Johnson had sold drugs earlier that evening; (5) Jacqueline Thompson, who brought Brooks and Brown to the location for the purchase of rocks of crack cocaine, regularly purchased that substance from Johnson at the Jenkins home; and (6) Johnson had an opportunity to examine and inspect the rocky substance contained in the sandwich bag that he obtained from Darryl Jenkins. Under these circumstances, we find that the trial court did not clearly err in allowing Michael Johnson to express his opinion, in the form of expert testimony, that the sandwich bag contained crack cocaine. Cf. United States, v. Marsalla, 164 F.3d 1178, 1179-80 (8th Cir. 1999) (finding that in making sentencing determination, district court justifiably relied upon experienced crack cocaine dealer's opinion that the substance she had purchased, visually inspected, and then sold to defendant was crack cocaine),

b. WEIGHT OF THE ROCKY SUBSTANCE
In a similar manner, Brooks asserts that the trial court clearly erred in allowing Johnson to express an opinion that the rocks in the sandwich bag each weighed one gram. We disagree with the position that Johnson was not qualified to express an opinion regarding the approximate weight of the rocks in the sandwich bag.[17] The State presented evidence that (1) Johnson was an experienced crack cocaine dealer; (2) he had previously seen a quantity of fifty or more rocks of crack cocaine on more than five occasions, and he had, on a prior occasion, weighed more than fifty rocks of cocaine on a digital, triple-beam scale; (3) in the drug trade, a "juggler," or rock of crack cocaine, is traded in one-gram increments; and (4) Johnson had the opportunity to examine and inspect the rocks in the sandwich bag, and he determined that the bag contained enough to sell fifty rocks that were "about a gram in size and identical in shape." Under these circumstances, the trial court properly allowed Johnson to give opinion testimony regarding the approximate weight of the rocks in the sandwich bag. See, e.g., State v. Gilbert, 507 So.2d 637, 638 (Fla. 5th DCA 1987) (finding that trial court erred in precluding narcotics officer from testifying about approximate weight of bag containing cocaine that was dumped by defendant in pond, stating "[a]n experienced narcotics officer (as well as a lay witness) can testify to the approximate weight of a given matter"); Madruga v. State, 434 So.2d 331, 332 (Fla. 3d DCA 1983) (finding that experienced drug enforcement officer could properly testify to the approximate weight of the marijuana at issue).

4. SUFFICIENCY OF THE EVIDENCE
In this claim, Brooks argues that the evidence presented at trial was insufficient to support a conviction for first-degree murder. In so arguing, Brooks asserts that the trial court erred in denying a motion for judgment of acquittal presented by his trial counsel at the close of the State's case and renewed at the close of all the evidence. The State responds, however, that the motions as presented by trial counsel were inadequate to preserve a sufficiency of the evidence claim for appellate review. Under the specific factual circumstances of this case, we agree with the State.
*895 At the close of the State's case during the guilt phase of the trial below, trial counsel for Brooks moved for a judgment of acquittal on his client's behalf. Specifically, his counsel stated, "I think we may technically have to offer our motions for directed judgment of acquittal, which I do without any further argument." Immediately thereafter, trial counsel for Foster Brown moved for judgment of acquittal on his client's behalf. Unlike the purely technical and superficial motion voiced on behalf of Brooks, Brown's counsel made specific arguments challenging the State's evidentiary proof of both first-degree premeditated murder and first-degree felony murder, with the possible underlying felonies of robbery and trafficking in cocaine. After noting that the alternative theories of attempted robbery or attempted trafficking in cocaine could also support a first-degree felony murder conviction, the trial court denied both motions. In a similar manner, the trial court denied all renewed defense motions for judgment of acquittal made after the defendants rested their cases without presenting any evidence.[18]
Under these factual circumstances, we conclude that the limited, boilerplate motions for judgment of acquittal which were of a technical and pro-forma nature as voiced by counsel for Brooks were totally inadequate to preserve a sufficiency of the evidence claim for appellate review. In so concluding, we are mindful that the trial court had previously permitted counsel for Brooks and Brown to adopt each others objections during trial, but such permission did not address or extend to substantive motions. Additionally, at the close of the State's case, counsel for Brooks merely adopted his earlier boilerplate motion. Accordingly, we find that the purely technical and pro-forma boilerplate motions for judgment of acquittal offered by Brooks were inadequate to preserve a sufficiency of the evidence claim for appellate review. See, e.g., Fla. R.Crim. P. 3.380(b) (stating, in pertinent part, that a motion for judgment of acquittal "must fully set forth the grounds on which it is based"); Woods v. State, 733 So.2d 980, 984-85 (Fla.1999); Archer v. State, 613 So.2d 446, 448 (Fla. 1993). Nevertheless, we will proceed to make an independent determination of whether the evidence presented at trial was sufficient to support Brooks' first-degree murder conviction. See, e.g., § 921.141(4), Fla. Stat. (1999); Fla. R.App. P. 9.140(h); Brown v. State, 721 So.2d 274, 277 (Fla.1998).
Brooks argues that the evidence was insufficient to support his first-degree murder conviction on either a theory of premeditation or felony murder with robbery, attempted robbery, trafficking in cocaine, or attempted trafficking in cocaine as the possible underlying felonies. We need not address his arguments regarding premeditation[19] or trafficking in *896 cocaine,[20] however, because, in our view, there is competent, substantial evidence in the record to support a jury verdict finding Brooks guilty of first-degree felony murder with robbery, attempted robbery, or attempted trafficking in cocaine as the possible underlying felonies. See Brown v. State, 644 So.2d 52, 53 (Fla.1994) ("Brown first claims that insufficient evidence was adduced showing premeditation. We need not reach this issue, however, because there was ample evidence supporting first-degree murder under a felony-murder theory....").
Robbery is defined as
the taking of money or other property which may be the subject of larceny from the person or custody of another, with the intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.
§ 812.13, Fla. Stat. (1995). In the present case, Michael Johnson testified that he did not receive money from either Brooks or Brown for the purchase of the crack cocaine. He further testified that when he started to count the rocks out, Brooks drew a weapon and fired at Jenkins when Jenkins questioned whether there was a problem. Moreover, Johnson testified that the sandwich bag containing the crack cocaine was on the trunk of his Impala when he began to run away once the shooting started, and he never saw the sandwich bag containing the rocks again. Finally, Lashan Mahone testified that (1) she exited the Impala immediately after the shooting stopped and Brooks and Brown had left; (2) she stopped, looked around, and had an opportunity to observe both the trunk of the Impala and the surrounding areas; and (3) as she surveyed the area, she did not see anyone else near the Impala, nor did she see any drugs on either the trunk or sides of that vehicle. We find that this direct and circumstantial evidence presented by the State amounts to competent, substantial evidence supporting a jury verdict finding Brooks guilty of first-degree felony murder with robbery as the underlying predicate offense.[21]Cf. Mungin, 689 So.2d at 1029 (finding circumstantial evidence supported first-degree felony murder conviction for robbery or attempted robbery where evidence showed that *897 defendant entered the store carrying a gun, money was missing from the store, money from the cash box was gone, someone tried to open cash register without knowing how, and defendant left the store carrying a paper bag).
We also conclude that there is competent, substantial evidence to support a jury verdict finding Brooks guilty of first-degree felony murder with attempted robbery as the underlying predicate offense. To prove attempted robbery, the State was required to present evidence establishing beyond a reasonable doubt that Brooks intended to commit a robbery and committed an overt act toward completion of that offense. See § 777.04(1), Fla. Stat. (1995). Even if we accepted the theory asserted by Brooks that someone other than Brooks or Brown removed the sandwich bag containing the crack cocaine after the shooting occurred,[22] there is competent, substantial evidence showing that Brooks intended to commit a robbery and made an overt act directed toward the completion of that crime.
Finally, in our view, there is competent, substantial evidence to support a jury verdict finding Brooks guilty of first-degree felony murder with attempted trafficking in 28 or more grams, but less than 150 kilograms, of cocaine or a mix of cocaine, as the underlying offense. To establish attempted trafficking in cocaine, the State was required to present evidence establishing beyond a reasonable doubt that Brooks intended to commit the offense and committed an overt act toward its completion. See § 777.04(1), Fla. Stat. (1995). The State was not required to prove that the substance involved was actually cocaine or a mixture thereof. See, e.g., Tibbetts v. State, 583 So.2d 809, 810 (Fla. 4th DCA 1991); Louissaint v. State, 576 So.2d 316, 317 (Fla. 5th DCA 1990). In accord with the reasoning of both Kocol v. State, 546 So.2d 1159 (Fla. 5th DCA 1989), and Spera v. State, 656 So.2d 550 (Fla. 2d DCA 1995), there is competent, substantial evidence in this case to support a jury verdict finding Brooks guilty of first-degree felony murder with attempted trafficking in cocaine as the underlying predicate offense.
In Kocol, the defendant agreed to supply his employee with an ounce of cocaine (which is slightly greater than 28 grams) for sale to a third party at a fixed price. See 546 So.2d at 1159. The employee met with the third party, collected $1300 from him, and delivered the money to the defendant. See id. at 1160. In return, the defendant gave the cocaine to the employee for delivery to the third party. See id. Based on this transaction, the defendant was charged and convicted of conspiracy to traffic in cocaine, sale of cocaine, and possession of cocaine.[23]See id. at 1159.
On appeal, the defendant asserted that the evidence was insufficient to sustain his conviction on the conspiracy to traffic count because the cocaine that was sold actually weighed 27.58 grams, slightly less than the requisite trafficking amount of 28 grams. See id. at 1160. In upholding the conspiracy to traffic conviction, the Fifth District stated, "The fact that the cocaine ultimately delivered was short of an ounce by less than a gram does not refute the intent of the parties at the time of the initial agreement." Id. This conclusion in Kocol was followed by the Second District in Spera, which involved similar facts. See 656 So.2d at 552.
Brooks relies on the First District's decision in Williams v. State, 592 So.2d 737 (Fla. 1st DCA 1992), to support his contention that the evidence in this case was insufficient to find him guilty of attempted trafficking in cocaine. In Williams, the First District distinguished Kocol because the defendant in Williams, unlike the defendant in Kocol, had not reached an *898 agreement on a specific amount of cocaine for the transaction. See id. at 739. Instead, the only agreement evidenced in Williams was that the defendant was willing to do a "big deal." See id. Under those circumstances, the court concluded that the evidence was insufficient to permit the jury to consider the charge of conspiracy to traffic in cocaine. See id.; see also Spivey v. State, 731 So.2d 61, 62 (Fla. 3d DCA 1999); Rodriguez v. State, 719 So.2d 1215, 1217 (Fla. 2d DCA 1998).
After reviewing the evidence presented in this case, it appears that this case is more similar to the situations in Kocol and Spera than it is to the situations in Williams, Spivey, or Rodriguez. Specifically, in this case, Michael Johnson testified that "jugglers," or rocks of crack cocaine, are traded in one-gram increments. Further, Jacqueline Thompson testified that Brooks and Brown were seeking to buy "jugglers" of crack cocaine. Finally, both Johnson and Thompson testified that Brooks and Brown sought fifty rocks but ultimately specifically expressed that they wished to obtain thirty rocks of crack cocaine. We find that this evidence was sufficient to establish that Brooks intended to obtain a specific amount of crack cocaine28 or more gramsthat was above the requisite amount to prove trafficking,[24] and we therefore determine that there is competent, substantial evidence to support a jury verdict finding Brooks guilty of first-degree felony murder with attempted trafficking in cocaine as the underlying offense.

5. JURY INSTRUCTIONS ON FIRST-DEGREE PREMEDITATED AND FELONY MURDER
In his final challenge relating to the guilt phase, Brooks argues that the trial court erred in instructing the jury on both first-degree premeditated murder and first-degree felony murder. The State correctly responds that defense counsel did not object to the jury instructions during trial, and therefore this claim was not preserved for appellate review. See, e.g., Gunsby v. State, 574 So.2d 1085, 1088 (Fla. 1991); Fla. R.Crim. P. 3.390(d). Furthermore, even if this claim had been preserved for appellate review, we would find it to be without merit:
While a general guilty verdict must be set aside where the conviction may have rested on an unconstitutional ground or a legally inadequate theory, reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient.
San Martin v. State, 717 So.2d 462, 470 (Fla.1998) (footnotes omitted). We again reject the claim as presented by Brooks.

C. THE PENALTY PHASE: COMMENTS MADE BY THE PROSECUTOR DURING CLOSING ARGUMENT
Brooks contends that the prosecutor made numerous improper comments during closing argument in the penalty phase of the trial, and, based on such comments, Brooks reasons that he is entitled to a new penalty phase hearing before a new jury. In making this argument, Brooks highlights that defense counsel contemporaneously objected to several of the prosecutor's allegedly improper comments, but he also candidly acknowledges that his trial counsel did not object to other such comments. As a general rule, this Court has determined that failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. See, e.g., McDonald v. State, 743 So.2d 501, 505 (Fla.1999); Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998); Chandler v. State, 702 So.2d 186, 191 (Fla.1997); Kilgore v. State, 688 So.2d 895, 898 (Fla.1996). The sole *899 exception to the general rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." McDonald, 743 So.2d at 505 (quoting Urbin, 714 So.2d at 418 n. 8, which, in turn, quoted Kilgore, 688 So.2d at 898). After carefully reviewing the prosecutor's penalty phase closing argument in this case, and considering the jury's close seven-to-five recommendation that Brooks be sentenced to death, we determine that the objected-to comments, when viewed in conjunction with the unobjected-to comments, deprived Brooks of a fair penalty phase hearing. Cf. Cochran v. State, 711 So.2d 1159, 1163 (Fla. 4th DCA 1998) ("Taken individually, in a different case, the prosecutor's comments may not have been so egregious as to warrant reversal. However, the remarks must be viewed cumulatively in light of the record in this case. Here, the improprieties in the prosecutor's closing argument reached the critical mass of fundamental error...."). We discuss in detail the improper comments made by the prosecutor in this case so that, hopefully, similar comments will not be repeated in future cases.
Initially, we note that the comments made by the prosecutor in this case are strikingly similar to comments made by the same prosecutor which were condemned in Urbin.[25] Indeed, as appellant notes in his brief, it appears that many of the comments in this case are the same as those made in Urbin, "with only the names of the victims and the defendants changed." Appellant's Initial Brief at 70-71 n. 13. With this in mind, we now analyze the portions of the prosecutor's penalty phase closing argument now challenged by Brooks in this Court.[26]
At the beginning of closing argument, the prosecutor presented a narrative describing the death of Darryl Jenkins. During this narrative, the prosecutor made statements such as "[Jenkins] did nothing, nothing to deserve being shot like a rabid dog on the driveway in front of his own home"; "[Jenkins] fell down to this cold cement, life flowed out of him"; "blood flowed onto that cold concrete"; "life flowed out of him, flowed out of him"; and "[Jenkins] died there on that cold slab of cement." Brooks argues that the prosecutor's comments were an improper "emotional portrayal of the victim's agony," Appellant's Initial Brief at 76, and constituted a type of "Golden Rule" argument denounced by this Court in Urbin. While we agree with Brooks that the prosecutor's description of the death in this case was an "emotional portrayal," we do not find that such description was improper, as was the description of the victim's death in Urbin, where the prosecutor "went far beyond the *900 evidence in emotionally creating an imaginary script that the victim was shot while `pleading for his life.'" Urbin, 714 So.2d at 421. The prosecutor's description here had a slight emotional flow but was properly confined to inferences based on record evidence and was therefore proper.[27]
Brooks next argues that the prosecutor impermissibly inflamed the passions and prejudices of the jury with elements of emotion and fear.[28] We agree. For example, in this case, the prosecutor used the word "executed" or "executing" at least six times; in Urbin, the prosecutor impermissibly used those terms at least nine times. See 714 So.2d at 420 n. 9. Additionally, in this case, the prosecutor characterized Brooks and Brown as persons of "true deep-seated, violent character"; "people of longstanding violence"; "they commit violent, brutal crimes of violence"; "it's a character of violence"; "both of these defendants are men of longstanding violence, deep-seated violence, vicious violence, brutal violence, hard violence ... those defendants are violent to the core, violent in every atom of their body." In Urbin, the prosecutor cast the defendant as showing his "true, violent, and brutal and vicious character", as a "cold-blooded killer, a ruthless killer": exhibiting "deepseeded [sic] violence. It's vicious violence. It's brutal violence"; and that Urbin was "violent to the core, violent in every atom of his body." 714 So.2d at 420 n. 9. Regarding the comments in Urbin, we stated, "Plainly, these are not isolated comments of the type we have deemed harmless in other cases, but rather are akin to the dehumanizing comments we found improper in Bonifay v. State, 680 So.2d 413, 418 n. 10 (Fla.1996)." 714 So.2d at 420 n. 9. Indeed, the almost verbatim incantation of these comments in both Urbin and this case is remarkable given this Court's unambiguous pronouncements over the last 50 years. See, e.g., Gore v. State, 719 So.2d 1197, 1201 (Fla.1998) ("It is clearly improper for the prosecutor to engage in vituperative or pejorative characterizations of a defendant or witness."); King v. State, 623 So.2d 486, 488 (Fla.1993) (stating that closing argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant"); Garron v. State, 528 So.2d 353, 359 (Fla.1988) ("When comments in closing argument are intended to and do inject elements of emotion and fear into the jury's deliberations, a prosecutor has ventured far outside the scope of proper argument."); Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985) (stating that closing argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law"); Adams v. State, 192 So.2d 762, 763 (Fla.1966) (quoting from Stewart v. State, 51 So.2d 494, 495 (Fla.1951): "The trial of one charged with crime is the last place to parade prejudicial emotions or exhibit punitive or vindictive exhibitions of temperament.").[29]
*901 Similarly, the prosecutor's "mercy" argument in this case tracks almost word for word the argument in Urbin which was classified as "blatantly impermissible" by this Court. 714 So.2d at 421. In Urbin, the prosecutor concluded his argument by stating: "If you are tempted to show this defendant mercy, if you are tempted to show him pity, I'm going to ask you to do this, to show him the same amount of mercy, the same amount of pity that he showed Jason Hicks on September 1, 1995, and that was none." Id. Here, the prosecutor concluded his argument as follows: "I'm going to ask you not to show mercy or pity to these defendants. What mercy or pity did they show Darryl Jenkins that night? But if you are tempted to show the defendants mercy or pity, I'm going to ask you to show them the same mercy, the same pity that they showed Darryl Jenkins on August 28, 1996, and that is none."[30] Again, long before the issuance of Urbin, this precise line of argument was specifically denounced by this Court. See Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992); Rhodes v. State, 547 So.2d 1201, 1206 (Fla.1989).
Brooks also submits that the prosecutor impermissibly argued "prosecutorial expertise."[31] The challenged comments began with the prosecutor's description of the mechanics of the penalty phase. The prosecutor then described the "death penalty weighing test," stating, "I would submit now that the State does not seek the death penalty in all first-degree murders because it's not always proper, not always appropriate." The prosecutor then posited facts of a first-degree murder involving a 16-year-old getaway driver and a 30-year-old, ex-convict triggerman, where "it wouldn't be just, it wouldn't meet the law of Florida to impose the death penalty against the 16-year-old." The prosecutor then stated:
Where, under the facts of the case in the law of Florida, that death penalty weighing test is met, it is proper to seek a death penalty. And I would submit to you, when you look at all the facts of this case and look at the law of Florida, it is clear that this is a case that demands the death penalty for both of those defendants for what they have done.
Brooks argues that these and similar comments by the prosecutor "undermine the jury's discretion in determining the proper punishment by implying he, or another authority, has already made the careful decision required." Appellant's Initial Brief at 70. As support, Brooks primarily relies on Pait v. State, 112 So.2d 380 (Fla. 1959).
In Pait, a death penalty case, the prosecutor stated during closing argument:
Before each murder trial that is prosecuted in this circuit, where I'm the State Attorney, a conference is held between me and my assistants to determine whether or not the facts in the case justify the State's giving maximum punishment under the law. I told you at the outset of this trial that if the facts in this case warranted this defendant being sent to the electric chair....
Id. at 383-84. On appeal, this Court found the error harmful, reasoning as follows:
In his argument, [the prosecutor] conveyed to the jury the fact that he and his staff had considered the matter before trial and had concluded that the death penalty should be requested. It is certainly appropriate for the prosecuting attorney to urge the jury to prescribe *902 the supreme penalty on the basis of the evidence which the jury hears. It is not appropriate to undertake to give the jury the benefit of the composite judgment of the State Attorney's staff allegedly reached on the basis of investigations and discussions taking place before the trial.
Id. at 384-85.
In this case, the prosecutor's comments clearly are not as blatant as those in Pait, as the prosecutor here was undoubtedly correct in stating that the State does not seek the death penalty in all first-degree murder cases. However, while that certainly is a true statement, it is also irrelevant and tends to cloak the State's case with legitimacy as a bona-fide death penalty prosecution, much like an improper "vouching" argument. See Gorby v. State, 630 So.2d 544, 547 (Fla.1993) (explaining that "[i]t is improper to bolster a witness' testimony by vouching for his or her credibility"). Therefore, we conclude that the trial court abused its discretion in overruling defense counsel's objection regarding this line of argument.[32]
Brooks next argues that the prosecutor in this case, as in Urbin, see 714 So.2d at 421 n. 12, misstated the law regarding the jury's recommendation of a death sentence. Specifically, in this case, the prosecutor stated: "And if sufficient aggravating factors are proved beyond a reasonable doubt, you must recommend a death sentence, unless those aggravating circumstances are outweighed, outweighed by the mitigating circumstances." This was an improper statement by the prosecutor, as "a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors." Henyard v. State, 689 So.2d 239, 249-50 (Fla.1996); cf. Garron, 528 So.2d at 359 & n. 7 (finding that it was a misstatement of the law to argue that "when the aggravating factors outnumber the mitigating factors, then death is an appropriate penalty"). Defense counsel objected to this misstatement, and in response the trial court correctly informed the jury concerning the law relating to the weighing of aggravating and mitigating circumstances. Thus, if the prosecutor's initial misstatement of the law were viewed in isolation, we would find that such misstatement was harmless error. See Henyard, 689 So.2d at 249.
Brooks also argues that the prosecutor misstated the law regarding the merged robbery and pecuniary gain aggravating circumstances.[33] We agree. After summarizing the evidence supporting the aggravating circumstances of prior violent felony, armed robbery, and pecuniary gain, the prosecutor stated:
Now the Judgethose are the three aggravating circumstances. And I submit to you, when you consider them togetherindividually they're all powerful aggravating circumstances that support a recommendation of death, but together, they present a powerful, overwhelming case for a recommendation of death.
Two of those aggravators merge, number[s] two and three, felony murder, robbery and financial gain, merge under the law because they're involving the same aspects of the crime. But I submit to you that, because they merge, that makes them even more powerful, even more weighty, even more demanding. *903 Demanding that the defendants be held fully accountable, to the full extent of the law.
Transcript. at 1543-44. Unlike Jackson v. State, 704 So.2d 500, 507 (Fla.1997), where we held that the prosecutor's comments regarding merged aggravating circumstances were permissible, the prosecutor here clearly argued that because the armed robbery and pecuniary gain circumstances merged, "that makes them even more powerful, even more weighty, even more demanding." This type of argument violates the principles set forth in Provence v. State, 337 So.2d 783, 786 (Fla. 1976):
The State argues the existence of two aggravating circumstances, that the murder occurred in the commission of the robbery (subsection (d)) and that the crime was committed for pecuniary gain (subsection (f)). While we would agree that in some cases, such as where a larceny is committed in the course of a rape-murder, subsections (d) and (f) refer to separate analytical concepts and can validly be considered to constitute two circumstances, here, as in all robbery-murders, both subsections refer to the same aspect of the defendant's crime. Consequently, one who commits a capital crime in the course of a robbery will always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged. Mindful that our decision in death penalty cases must result from more than a simple summing of aggravating and mitigating circumstances, State v. Dixon, 283 So.2d 1, 10 (Fla.1973), we believe that Provence's pecuniary motive at the time of the murder constitutes only one factor which we must consider in this case.
If we were to allow the type of argument made by the prosecutor here, then an individual who commits a capital crime in the course of robbery would always begin with a "more weighty" aggravating circumstance than those who commit a capital crime in the course of any other enumerated felony. The prosecutor's comments in this regard were improper.
Next, we find that the prosecutor clearly overstepped the bounds of proper argument by stating:
I'm concerned about the temptation some of you may have, and that is that you may want to take the easy way out and not weigh out all the aggravating circumstances, not analyze the law or the facts, take the easy way out and just quickly vote for life.
I submit to you, don't do that; follow the law, do your duty. Weigh everything all out. When you do, you will see that the aggravating circumstances create a powerful case for a recommendation of life [sic]. They are not outweighed by those flimsy, I would submit to you, phantom, mitigating circumstances.
Transcript at 1555.[34] Again, these comments are similar to comments made in Urbin:
[M]y concern is that some of you may be tempted to take the easy way out, to not weigh the aggravating circumstances and the mitigating circumstances and not want to fully carry out your responsibility and just vote for life.... I'm going to ask you not be swayed by pity or sympathy.... I'm going to ask you to follow the law. I'm going to ask you to do your duty.
714 So.2d at 421; cf. Garron, 528 So.2d at 359 & n. 10 (determining prosecutor misstated law in arguing to jury it "is your sworn duty as you come in and become jurors to come back with a determination *904 that the defendant should die"). These comments made by the prosecutor were egregiously improper. Further, the prosecutor's characterization of the mitigating circumstances as "flimsy," "phantom," and repeatedly characterizing such circumstances as "excuses," was clearly an improper denigration of the case offered by Brooks and Brown in mitigation.[35]See Urbin, 714 So.2d at 422 n. 14.
Finally, Brooks argues that the prosecutor's references to both Brooks' counsel and Brown's counsel constituted an attack on them personally and on their credibility, with the import of the comments being that "criminal defense lawyers," and these lawyers in particular, are unworthy of belief. Brooks argues that the trial court abused its discretion in overruling the defense objection that the prosecutor's statement was a personal attack. We agree.
As a precursor to discussing the mitigating circumstances to be considered, the prosecutor stated the following:
I'd like to make this comment to you: During opening statement of the guilt part of the trial, and during the closing arguments of the guilt part of the trial, about a week and a half ago, those two criminal defense lawyers got up here and they told you that the evidence would show you that the defendants were not guilty of murder and aggravated battery, and they looked you straight in the eye when they told you that. And I would submit to you that the evidence that came out during the trial proved to you beyond a reasonable doubt that the defendants were guilty of first-degree murder and aggravated battery.
The evidence produced at trial disproved what those two criminal defense lawyers argued to you.
Transcript at 1544-45. Defense counsel objected to these comments, claiming that they constituted a personal attack on defense counsel. After admonishing defense counsel not to make speaking objections, the trial court overruled the objection, stating that the prosecutor's comments were not a personal attack, but merely a proper comment on the evidence. Thereafter, the prosecutor continued:
I submit to you that the evidence that you heard during the guilt part of the trial did not support what the defense lawyers argued to you. They argued to you that the defendants were not guilty, and that's what the evidence, they claim, supported a verdict of. The evidence did not support what they argued to you, and I would submit to you that I expect them to get up here and argue to you that the law and the evidence that you've heard will support a recommendation of life.
I'm going to submit to you that, if you look at all the evidence that's been presented to you in this case and you listen carefully to the law, that, once again, the evidence and the law will not support is not going to support what those two criminal defense lawyers are going to argue to you.
Transcript at 1546-47. While certainly not as egregious as comments discussed in other appellate decisions, see, e.g., Del Rio v. State, 732 So.2d 1100, 1101 (Fla. 3d DCA 1999) (prosecutor stated, "See this man here who claims to be a lawyer in good standing in Miami, Florida," and "[t]hat is the same guy who is going to get up when I sit down and try to tell you what the evidence showed."); Redish v. State, 525 So.2d 928, 931 (Fla. 1st DCA 1988) (finding prosecutor's reference to defense counsel's alleged "cheap tricks" constituted an improper personal attack on defense counsel), we find that the prosecutor's references to defense counsel in this case transcended the bounds of legitimate *905 comment on the evidence and implied that the jury could not believe defense counsel or the arguments asserted by them. See Fryer v. State, 693 So.2d 1046, 1051 (Fla. 3d DCA 1997) (finding prosecutor's statement that "he knows that his client is guilty," which was made shortly after defense counsel concluded arguing that the evidence had failed to prove his client guilty, "constituted a direct attack on the defense attorney's character, essentially calling him a liar"); cf. Lewis v. State, 711 So.2d 205 (Fla. 3d DCA 1998) (finding prosecutor's statement that manner in which defense questioned the evidence was "lame" constituted an improper attack on defense counsel). Therefore, we conclude that the trial court abused its discretion in overruling defense counsel's objections to these improper comments.
In recently reversing a first-degree murder conviction and vacating a death sentence, this Court concluded:
The prosecutor in this case exceeded the bounds of proper conduct and professionalism and provided a "textbook" example of overzealous advocacy. This type of excess is especially egregious in this, a death case, where both the prosecutors and courts are charged with an extra obligation to ensure that the trial is fundamentally fair in all respects.
Gore, 719 So.2d at 1202. Viewed in totality, we reach the same conclusion in this case, especially considering the seven-to-five jury recommendation for the death sentence. Moreover, in light of this prosecutor's "track record," we must repeat the following observation made by this Court almost forty years ago:
It should be noted that the remarks of the prosecutor were not provoked by irritations or proddings by the defense counsel. They were not mere casual innocuous observations made during an impassioned appeal. The record here suggests that the objectionable arguments were tendered calmly and in a fashion calculated to forestall a mercy recommendation.

Pait, 112 So.2d at 385 (emphasis added) (footnote omitted). Accordingly, after considering the cumulative effect of the numerous, overlapping improprieties in the prosecutor's penalty phase closing argument, as well as the jury's seven-to-five vote for a death sentence, we vacate the sentence imposed upon Brooks and remand for a new penalty phase hearing before a new jury.[36]

III. CONCLUSION
Based on the foregoing, we affirm Brooks' first-degree murder conviction, reverse his death sentence, and remand for a new penalty phase hearing before a new jury.
It is so ordered.
SHAW, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
LEWIS, J., concurs specially with an opinion, in which SHAW, ANSTEAD and PARIENTE, JJ., concur.
*906 HARDING, C.J., concurs as to conviction and dissents as to sentence.
WELLS, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
LEWIS, J., specially concurring.
I concur in affirming Brooks' conviction, reversing his sentence, and remanding for a new penalty phase hearing before a new jury. I write specially to address the penalty-phase closing argument made by the prosecutor during the trial below. In my view, this Court's recent decision in Urbin v. State, 714 So.2d 411 (Fla.1998), leads to the inescapable conclusion that the prosecutor's argument constituted inappropriate advocacy and requires reversal for a new penalty phase hearing.
Upon analysis, this Court in Urbin considered virtually identical not objected to but inappropriate argument to be of such importance to the fair administration of justice and the constitutional application of capital punishment that it specifically stated that any failure to acknowledge and disapprove such argument would amount to neglect of this Court's judicial duty. If the decisions of this Court are to have meaning, particularly in the context of argument in connection with the imposition of capital punishment, we must have uniform application of the standards announced by this Court and not random application which, in my view, leads to confusion and destabilizes the law. I must respectfully but pointedly disagree with the dissenting view that Urbin should not be followed here. I conclude that we must either follow and give meaning to the standards announced in Urbin, or reject its pronouncements and articulate the standard we deem appropriate that should be applied on a uniform basis.
In Urbin, after reversing the defendant's death sentence on proportionality grounds, this Court proceeded to discuss the prosecutor's[37] penalty-phase closing argument, stating that "we would be remiss in our supervisory responsibility if we did not acknowledge and disapprove of a number of improprieties in the prosecutor's closing penalty-phase argument." Id. at 419. The Court then delineated the specific arguments it found to be improper, including, but not limited to, (1) the repeated use of the word "executed" or "executing," id. at 420 n. 9; (2) the repeated description of the defendant as a person of violence, id.;[38] (3) urging the jury to afford the defendant the same mercy that the defendant displayed towards the victim, see id. at 421; (4) asserting that any juror's vote for a life sentence would be irresponsible and a violation of the juror's lawful duty, see id.; and (5) misstating the *907 law regarding the jury's obligation to recommend death. See id. at 421 n. 12. As thoroughly discussed in the majority opinion, many of the same arguments condemned in Urbin were repeated by the prosecutor in this case. See Majority. op. at 46-55.[39]Urbin and the present case simply cannot be distinguished on the basis of degrees of violence because the defendant in Urbin was involved in no less violent conduct than Brooks here. The victim in Urbin was forced to the ground and had sustained additional injuries consistent with having been beaten in the face with a pistol before being shot. The court also found an aggravating circumstance for imposition of the death penalty to be a second felony involving a home invasion armed robbery and kidnapping.
Although not the direct holding, the analysis of the prosecutor's penalty-phase closing argument set forth in Urbin clearly delineated specific arguments that this Court found to be not simply improper but "blatantly" impermissible. It would be inconsistent for this Court to determine specific arguments to be improper in Urbin a case where such a determination did not affect the outcome of the caseand then reach an opposite conclusion in this case where such a determination actually impacts the outcome of the case resulting in an execution. Perhaps more importantly, if the Court performed such an "about-face" it would not only suggest that the death penalty is being imposed in this state in an arbitrary and capricious manner, but also generate additional constitutional arguments. As the entity charged with ensuring that the death penalty in Florida is constitutionally applied, this Court must be mindful not to create such circumstances, but instead strive for uniformity.
Accordingly, for these reasons, I concur in the majority's analysis regarding the penalty-phase closing argument issue.
SHAW, ANSTEAD and PARIENTE, JJ., concur.
WELLS, J., concurring in part and dissenting in part.
I concur as to the affirmance of the conviction.
I dissent from the reversal of the death sentence in this case on the basis of what the majority perceives as the prosecutor's improper closing argument. I have carefully reviewed that argument and conclude that not only was it in its totality within the bounds of what the Court's prior case law has recognized as appropriate advocacy, it certainly did not rise to a level of fundamental error.
This case was tried in 1997. Therefore, what this Court said in its 1996 opinion in Bonifay v. State, 680 So.2d 413 (Fla.1996), is applicable:
Wide latitude is permitted in arguing to a jury. Thomas v. State, 326 So.2d 413 (Fla.1975); Spencer v. State, 133 So.2d 729 (Fla.1961), cert. denied, 369 U.S. 880, 82 S.Ct. 1155, 8 L.Ed.2d 283 (1962), cert. denied, 372 U.S. 904, 83 S.Ct. 742, 9 L.Ed.2d 730 (1963). Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. Spencer. The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown. Thomas; Paramore v. State, 229 So.2d 855 (Fla.1969), modified, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972). A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe *908 verdict of guilt than it would have otherwise done." Darden v. State, 329 So.2d 287, 289 (Fla.1976), cert. denied, 430 U.S. 704, 97 S.Ct. 1671, 51 L.Ed.2d 751 (1977). Each case must be considered on its own merits, however, and within the circumstances surrounding the complained of remarks. Id. Compare Paramore with Wilson v. State, 294 So.2d 327 (Fla. 1974).

Breedlove v. State, 413 So.2d 1, 8 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982).
680 So.2d at 418 (parallel citations omitted).
I conclude that in the instant case the majority does not give "wide latitude" or respect the discretion of the trial court. Nor do I believe this case is controlled by Urbin v. State, 714 So.2d 411 (Fla.1998). The majority's comments in Urbin concerning argument were dicta and should not be read as receding from this Court's longstanding case law giving the State latitude in making its argument. The Urbin majority specifically noted that what was said in respect to the prosecutor's argument was advisory and did not deal with the issue of whether the argument was objected to or was fundamental error.
I am particularly troubled that the majority holds that it was fundamental error to allow a prosecutor to argue defendants to be persons of "true deep-seated violent character"; that they are "people of longstanding violence"; that they "commit violent, brutal crimes of violence"; and that they have a "character of violence." This was penalty-phase argument. The jury was evaluating aggravating circumstances for purposes of the evaluation of defendant's character. Section 921.141(1), Florida Statutes, provides: "[e]vidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant. ..." (Emphasis added.) In the trial judge's sentencing order he found established as an aggravator that defendant Brooks had been previously convicted of five felonies, including the use or threat of violence. These felonies included a robbery of a grocery store using a sawed-off shotgun. These felonies included a kidnapping and armed robbery. To hold that it was improper for the State to argue that this defendant has a character of violence is contrary to this Court's long-standing case law and unduly restricts the State from being able to argue the evidence. I do not find that to be error, but clearly it was not fundamental error.
I am very concerned about what appears to me to be an aggressive expansion by this Court of the doctrine of fundamental error as applied to a prosecutor's closing argument. In this argument defendant's counsel did make several objections. A couple of objections were sustained. There were no motions for mistrial.
The expressions concerning the defendant's violent character and the use of the word "executed" were not the subject of objections. It appears to me that the majority is approaching a doctrine of fundamental error which encompasses a correctness of speech which has never been part of our advocacy system-especially at the appellate level.
I see two major problems with the majority's approach. First, an appellate majority analysis from a cold record of "correct speech" will boil down to what Judge Griffin noted in her dissent in Henry v. State, 743 So.2d 52, 58 (Fla. 5th DCA 1999), as "attempting to measure the effect the prosecutor's statement has on the collective sensibilities of the reviewing court." Correctness will shift from panel to panel. Certainly there are words and expressions which are and should be out of bounds, but appellate initiation of a limitation on a particular word use must be tightly reined or the Court will be quickly overwhelmed with censorship disputes.
Second, word and expression limitations fit precisely within the reason for our contemporaneous objection rule. The trial *909 court is seeing the use of words and expression in the flesh and in context. If a word such as "executed" is so out of bounds in the context of what is developing in the case before the trial judge, the trial judge must be provided an opportunity to correct it so that another word may be substituted. It has to be left to defense counsel to make an objection because a trial judge who steps in on his or her own runs the risk of stepping in to the detriment of a defense counsel's strategy. It often is the case that counsel believes that the other counsel's argument is overbearing and has an adverse effect on the jury. Leaving strategic decisions, especially closing argument decisions, to trial counsel is how advocacy works. In actuality, the use of the word "executed" in the context of the way it was argued does not even read that badly, and I have to conclude it must not have sounded out of bounds since no objection was made to it.
I voted with the majority in Ruiz v. State, 743 So.2d 1 (Fla.1999), because of the prosecutor's personal discussion of her father's heroism. However, Ruiz was not intended, at least by me, to pave the way for an expansion of the application of the doctrine of fundamental error and certainly not a spawning of a doctrine which would be routinely analyzing at the appellate level the correctness of speech.
QUINCE, J., concurs.
NOTES
[1] The trial court also adjudicated Brooks guilty of aggravated battery and sentenced him to thirty years in prison for that offense, but the validity of such judgment and sentence is not challenged in this appeal.
[2] The State either nol prossed or severed all but the first-degree murder and aggravated battery charges pending against Brooks and Brown.
[3] Tony Carr testified that on August 27, 1996, between the hours of 4 and 6 p.m., he "rented", for $50, his candy-apple red 1995 Toyota Camry LE Sports Coupe to Brown, whom he had known for about four years, and Brooks, whom he did not know. The Camry was not returned that evening as agreed, however, and law enforcement officials found the vehicle abandoned approximately one week later.
[4] Thompson testified that she had never bought drugs directly from Jenkins, and during the drug buy that took place at Jenkins' house earlier in the evening, she had made the purchase from either an individual named "Mall" or an individual named "Shack."
[5] Three eyewitnessesMichael Johnson, Lashan Mahone, and Jessie Bracelettestified that the transaction took place near the trunk area on the passenger side of Johnson's Impala. Jacqueline Thompson testified at trial that the transaction took place between the Camry and the Impala. Tyrone Simmons did not specifically indicate where the transaction took place, but he did indicate that Brooks and Brown walked towards the driveway to conduct the transaction.
[6] Jacqueline Thompson testified that she saw Brown give $300 to Johnson.
[7] Mahone further testified that the gunman backed up alongside the Impala and stopped for ten to fifteen seconds next to the window, close enough to touch. She saw his right profile but did not recognize him that night. Later, the police showed her photographs on three separate occasions, and although she recognized Brooks' front-profile picture the first two times, she could not say he was the gunman. After being shown a side-profile picture of Brooks during the third interview, she indicated that Brooks looked like the gunman. At trial, Mahone could not say with certainty that Brooks was the gunman, but she did state that the gunman "looked just like" Brooks.
[8] Thompson testified that on the morning after the shooting, Brooks came to her house and, after indicating that Jenkins was dead, said "Bitch, you didn't see nothing." Thompson also testified that she saw Brown three or four days after the shooting, at which time he said, "Tell them we from Georgia."
[9] According to testimony adduced during the penalty phase, Brooks' mother died on June 28, 1996. Although the sentencing order correctly reflects this date, it then states that Brooks' mother died "seven weeks after the defendant murdered Darryl Jenkins, and while the defendant was in jail awaiting trial." However, because the offense at issue here occurred on August 28, 1996, such statement in the sentencing order must be in error.
[10] The court noted that prior to an amendment passed by the Legislature in 1996, see chapter 96-302, section 1, at 1355, Laws of Florida, Brooks' family background would have been considered as a nonstatutory mitigating circumstance. Compare § 921.141, Fla. Stat. (1995) (listing statutory mitigating circumstances), with Allen v. State, 662 So.2d 323, 329 (Fla.1995) (noting trial court's proper consideration of family background as nonstatutory mitigating circumstance). While it is clear that Brooks committed his offense before the 1996 amendment took effect, see id., section 2, at 1355 (effective October 1, 1996), the trial court did not err in considering Brooks' family background as a statutory mitigating circumstance. Cf., e.g., Trotter v. State, 690 So.2d 1234, 1236-37 (Fla.1996), cert. denied, 522 U.S. 876, 118 S.Ct. 197, 139 L.Ed.2d 134 (1997).
[11] The issues raised by Brooks are set forth in an initial brief filed by his appellate counsel and a pro se supplemental brief filed by Brooks, with this Court's permission, on his own behalf.
[12] Both the initial brief filed by Brooks' appellate counsel and Brooks' pro se supplemental brief address the admissibility of certain portions of Michael Johnson's testimony and the sufficiency of the evidence. We consider the various arguments presented in both briefs concerning those issues in conjunction with one another.
[13] In his pro se supplemental brief, Brooks actually combines the issues involving consolidation of his case with Brown's and bifurcation of the penalty phase hearing. However, because those issues actually touch upon different phases of his trial, we have separated them for consideration here.
[14] Because we reverse Brooks' death sentence and remand for a new penalty phase hearing before a new jury, we do not address the remaining four claims raised by Brooks concerning his sentence and the original penalty phase hearing.
[15] The present case is distinguishable from Thompson v. State, 615 So.2d 737 (Fla. 1st DCA 1993), because in that case, after the trial court denied the defendant's motion in limine seeking to bar admission of collateral crime evidence, defense counsel later renewed an objection before both witnesses introducing such evidence took the stand. See id. at 744; see also Cox v. State, 563 So.2d 1116, 1117 (Fla. 4th DCA 1990) (finding collateral crime evidence issue preserved for appellate review because defense counsel objected to admission of such evidence during side-bar conference); Donaldson v. State, 369 So.2d 691, 694 (Fla. 1st DCA 1979) (finding that even though defense counsel did not object "at the time of each and every offer" of bad character evidence, issue concerning admission of such evidence was properly preserved for appellate review by defense counsel's general objection).
[16] We address Brooks' claim on the merits because we disagree with the State's argument that the claim has not been preserve for appellate review. While defense counsel did not immediately object to Johnson's initial testimony concerning the identity and weight of the rocky substance in the sandwich bag, counsel did raise several objections regarding such testimony shortly after it was offered and during the same line of questioning. Based on these objections, a voir dire examination was conducted to ascertain the admissibility of Johnson's opinion testimony. Under these circumstances, we find that the claim has been preserved for appellate review. See Jackson v. State, 451 So.2d 458, 460, 460 n. 1 (Fla.1984) (finding defense counsel's objection timely when made during line of questioning eliciting impermissible and prejudicial testimony); see also Johnston v. State, 497 So.2d 863, 868-69 (Fla.1986); Rohan v. State, 384 So.2d 683, 685 (Fla. 4th DCA 1980).
[17] We agree with Brooks that the trial court clearly erred in allowing Johnson to express his opinion that each rock in the sandwich bag weighed exactly one gram, as there was not a sufficient predicate establishing that Johnson was qualified as an expert in determining the exact weight of crack cocaine rocks by visual inspection. However, we find that this error was harmless because, as explained below, there was sufficient evidence to support Brooks' first-degree murder conviction on a felony murder theory with robbery, attempted robbery, or attempted trafficking in 28 or more grams of cocaine as the possible underlying felony offenses; proof of such offenses did not depend upon Johnson's testimony regarding the exact weight of the rocks in the sandwich bag.
[18] In renewing the motion for judgment of acquittal, Brown's counsel stated, "I know we made our motion for judgment of acquittal. I didn't know if we had actually renewed our motion for judgment of acquittal. If we have not, I would do that at this time." Immediately thereafter, Brooks' counsel stated, "I don't think we did and I would join in that." We note that renewing a motion for judgment of acquittal at the close of all the evidence is no longer necessary to preserve a sufficiency of the evidence claim for appellate review. See Morris v. State, 721 So.2d 725, 726 (Fla. 1998); see also Amendment to Florida Rule of Criminal Procedure 3.380(b), 745 So.2d 319 (Fla.1998) (amending rule 3.380(b) of the Florida Rules of Criminal Procedure to reflect holding in Morris).
[19] Premeditation, as an element of first-degree murder, is defined as

more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Woods v. State, 733 So.2d 980, 985 (Fla.1999) (quoting Wilson v. State, 493 So.2d 1019, 1021 (Fla.1986)). Brooks primarily argues that, like the situations in Mungin v. State, 689 So.2d 1026 (Fla.1995), and Jackson v. State, 575 So.2d 181 (Fla.1991), the evidence presented by the State in this case did not exclude the hypothesis that Jenkins' death resulted from a reflexive shooting, not by premeditated design. Unlike Mungin and Jackson, however, the State presented eyewitness testimony in this case (1) identifying Brooks as the gunman; (2) showing that the shooting was unprovoked; and (3) showing that there was a continuing attack. Based on the evidence that Brooks shot Jenkins immediately after Jenkins questioned what was wrong, the present case appears similar to Hamblen v. State, 527 So.2d 800, 805 (Fla.1988), where this Court determined that even though the defendant's conduct "was more akin to a spontaneous act without reflection," such conduct "unquestionably" demonstrated premeditation.
[20] The State attempted to establish at trial that Brooks committed the offense of trafficking in 28 or more grams, but less than 150 kilograms, of cocaine or a mixture of cocaine, in violation of section 893.135(1)(b)1., Florida Statutes (1995). To establish guilt on this offense, the State was required to prove beyond a reasonable doubt that Brooks knowingly actually or constructively possessed, or aided and abetted Brown in the actual or constructive possession of, the requisite amount of a substance that was, in fact, crack cocaine. While we do not determine the sufficiency of the evidence presented by the State to establish this offense, we note that the State did present evidence, including Michael Johnson's testimony regarding the identity and weight of the rocks in the sandwich bag, directed to the establishment of the trafficking offense.
[21] Brooks argues that the testimony of Jacqueline Thompson, Tyrone Simmons, and Jessie Bracelet established that Johnson had been paid for the crack rocks in the sandwich bag and that Brooks drew his gun to "persuade" Johnson to hand over what had been paid for. We note that Johnson's testimony directly conflicted with the version of events favorable to Brooks, and the jury was not required to believe the version of events favorable to Brooks where the State had produced conflicting evidence. See, e.g., Woods v. State, 733 So.2d 980, 986 (Fla.1999).
[22] We find this theory to be unreasonable in light of Lashan Mahone's testimony.
[23] The fact that Kocol involved conspiracy, rather than attempt, does not render that case inapplicable here.
[24] Brooks correctly does not argue that there was no "overt act" in this case.
[25] Unfortunately, this type of repetitive, overzealous advocacy is not confined to the prosecutor in Urbin and in this case. See, e.g., Fonticoba v. State, 725 So.2d 1244, 1245 n. 1 (Fla. 3d DCA 1999) (fourth case before the court featuring a certain prosecutor's "`unprofessional and unethical' behavior"); Izquierdo v. State, 724 So.2d 124, 125 n. 1 (Fla. 3d DCA 1998) (referring same prosecutor to The Florida Bar). Additionally, the problem seemingly is not limited to individual prosecutors. See Palazon v. State, 711 So.2d 1176, 1178 n. 2 (Fla. 2d DCA 1998) (Blue, J., concurring) (commenting, "Although actual data is not available, it is the impression of this writer and other members of this court that an unusually high proportion of these cases originate" in a certain judicial circuit).
[26] Brooks points out that even the trial court found it necessary to make a sua sponte interruption during closing argument and issue a curative instruction after the prosecutor made a biblical reference to "thou shalt not kill." Brooks does not challenge the trial court's action in this regard, and we find that the trial court appropriately dealt with this improper comment. See, e.g., Lawrence v. State, 691 So.2d 1068, 1074 n. 8 (Fla.1997) (cautioning prosecutors "that arguments invoking religion can easily cross the boundary of proper argument and become prejudicial"); Ferrell v. State, 686 So.2d 1324 (Fla.1996).
[27] We also reject Brooks' argument regarding comments made by the prosecutor concerning victim impact evidence that was admitted during the penalty phase.
[28] During this extended portion of the argument, the defense eventually twice objected to the repetitive comments made by the prosecutor. Transcript at 1537-38.
[29] Although this sampling of the caselaw is by no means exhaustive, it demonstrates that this Court has clearly and consistently condemned improper prosecutorial argument through the generations. For that reason, the State's argument that "to the extent that Urbin arguably sets forth a new rule of law, unless this Court explicitly states otherwise, a rule of law which is to be given prospective application does not apply to those cases which have been tried before the rule is announced," Appellee's Answer Brief at 60, is meritless on its face. Urbin simply reiterated what this Court's decisions have declared time and time again. Clearly, the State ignores the extensive case law citations throughout the opinion in Urbin, as well as the penultimate paragraph which begins, "The fact that so many of these instances of misconduct are literally verbatim examples of conduct we have unambiguously prohibited in Bertolotti, Garron, and their progeny...." Urbin, 714 So.2d at 422. The State also overlooks the statement, "This Court has so many times condemned pronouncements of this character in the prosecution of criminal cases that the law against it would seem to be so commonplace that any layman would be familiar with and observe it," commentary found in a 1951 opinion. Stewart v. State, 51 So.2d 494, 494 (Fla.1951).
[30] Defense counsel did not object to these closing comments made by the prosecutor.
[31] Defense counsel objected to this line of argument, which the trial court overruled.
[32] We do not condemn the prosecutor's use of hypothetical example to explain the death penalty weighing process; the example was improper only to the extent that it connected with the State's decision of when to seek the death penalty. Tangentially, we note that in light of this Court's decision in Brennan v. State, 754 So.2d 1, 6 (Fla.1999), the prosecutor's specific hypothetical example involving a sixteen-year-old defendant would be improper and misleading because, in Florida, the death penalty may not be constitutionally imposed on a defendant who was under the age of seventeen at the time the murder was committed.
[33] Defense counsel did not object to this line of argument.
[34] Defense counsel did not object to this line of argument, which immediately preceded the improper "mercy" argument discussed above.
[35] Although defense counsel did not object to the actual terms used by the prosecutor in describing the case in mitigation, counsel did object to the prosecutor's continued references to the weight of the mitigating circumstances; the trial court overruled that objection.
[36] Although not objected to below, challenged by Brooks here, or considered by us in reversing his sentence, it is clear that the prosecutor's repeated comments regarding the defendants' "early release" from various prison sentences were marginally relevant and, in several instances, misleading. The comments were marginally relevant because the only sentencing options in this case were death or life without possibility of parole, see section 775.082(1), Florida Statutes (Supp.1994) (making life without possibility of parole applicable sentencing option for capital offenses committed on or after May 25, 1994), and therefore the "early release" comments would have been relevant only to show lack of rehabilitation. Moreover, several of the prosecutor's "early release" comments were misleading because those comments were coupled with statements that Brooks or Brown were released early out of "mercy." This position overlooks the fact that many prisoners were released early due to legislative attempts at reducing prison overcrowding. See Gomez v. Singletary, 733 So.2d 499, 500 (Fla.1998). On remand, counsel for the State must be mindful of these facts.
[37] As noted by the majority, the prosecutor in both Urbin and this case are same person. Majority op. at 899.
[38] In Urbin, the prosecutor cast the defendant as showing his "true, violent, and brutal and vicious character"; as a "cold-blooded killer, a ruthless killer;" exhibiting "deepseeded [sic] violence. It's vicious violence. It's brutal violence"; and that Urbin was "violent to the core, violent in every atom of his body." Urbin v. State, 714 So.2d 411, 420 n. 9 (Fla.1998). This Court stated that such comments were "not isolated comments of the type we have deemed harmless in other cases, but rather are akin to the dehumanizing comments we found improper in Bonifay v. State, 680 So.2d 413, 418 n. 10 (Fla. 1996)." Urbin, 714 So.2d at 420 n. 9. In dissenting on the closing argument issue here, Justice Wells relies on Bonifay for the well-recognized general proposition that attorneys should be afforded "wide latitude" in presenting argument to the jury. However, this Court's analysis in Urbin finding the prosecutor's aforementioned comments to be improper clearly indicates that such comments were outside the scope of the "wide latitude" standard. See also Bonifay, 680 So.2d at 418 n. 10. Indeed, it would be inconsistent (and perplexing) to hold such comments to be improper in Urbinwhere the prior violent felony aggravating circumstance was established based on the defendant's convictions for armed robbery, armed burglary, and armed kidnapping, see 714 So.2d at 414and hold similar comments made by the prosecutor in this case to be proper because Brooks and Brown had both been previously convicted of violent felonies, as suggested by Justice Wells.
[39] The majority opinion also discusses other arguments made by the prosecutor in this case that were improper in light of decisions other than Urbin. See Majority. op. at 901-905 (discussing improper "prosecutorial expertise" comments; misstatement of the law regarding the merged robbery and pecuniary gain aggravating circumstances; and improper personal attack on defense counsel).